FILED
United States Court of Appeals
Tenth Circuit

June 5, 2013

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

MISTI LEE SCHNEIDER,

        Plaintiff-Appellant/
        Cross-Appellee,

v.

THE CITY OF GRAND JUNCTION
POLICE DEPARTMENT, an agency of
the City of Grand Junction; BILL
GARDNER; JOHN CAMPER;
WILLIAM D. BAKER; JOHN A. ZEN;
RICK DYER,

        Defendants-Appellees/
        Cross-Appellants,

and

JOHN AND JANE DOES, 3-10, in their
official and individual capacities,

        Defendants.

Nos. 12-1086 & 12-1115

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 1:10-CV-01719-MSK-KLM)**

---

Clayton E. Wire (Elizabeth A. Starrs and Elizabeth L. "Booka" Smith with him on the brief), of Starrs Mihm LLP, Denver, Colorado, for Plaintiff-Appellant/Cross-Appellee.

Thomas S. Rice (Monica N. Kovaci with him on the brief), of Senter Goldfarb & Rice, L.L.C., Denver, Colorado, for Defendants-Appellees/Cross-Appellants.

Before **KELLY**, Circuit Judge, **HOLLOWAY**, Senior Circuit Judge, and **MATHESON**, Circuit Judge.

**MATHESON**, Circuit Judge.

Plaintiff Misti Lee Schneider alleged in her complaint that Glenn Coyne, a Grand Junction Police Department ("GJPD") officer, responded to her 911 call about an altercation with her teenage son and, during a visit to her home late the next night, raped her. Shortly thereafter, Officer Coyne was arrested and fired, and a few days later committed suicide.

Ms. Schneider sued Officer Coyne's supervisors and the GJPD under 42 U.S.C. § 1983, alleging violation of her substantive due process right to bodily integrity. She alleged that inadequate hiring and training of Officer Coyne, inadequate investigation of a prior sexual assault complaint against him, and inadequate discipline and supervision of him caused her to be raped.

In district court, the defendants did not contest Ms. Schneider's allegations about Officer Coyne's conduct. They moved for summary judgment on the grounds that Officer Coyne did not act under color of state law and that Ms. Schneider could not prove, as § 1983 law requires, that they caused the rape or were deliberately indifferent to the risk that it would happen.

The district court denied summary judgment on the first ground, holding that a reasonable jury could conclude that Officer Coyne acted under color of state law. It

granted summary judgment on the second ground, concluding that Ms. Schneider could not prove essential facts to establish § 1983 liability. She appeals that ruling. The defendants cross-appeal the color of state law ruling.

The events alleged in this case are tragic, and Officer Coyne's alleged conduct was a terrible crime. The state cannot prosecute Officer Coyne because he is dead, and Ms. Schneider is left with suing his supervisors and employer. As explained below, to hold them liable for Officer Coyne's actions, she faces stringent proof requirements under § 1983 law, proof she is unable to muster. Although the police department's handling of Officer Coyne could and should have been better, we are bound to follow the law, apply it to the evidentiary record before us, and affirm the district court.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the district court's decision in Ms. Schneider's appeal (No. 12-1086), and we dismiss the defendants' cross-appeal (No. 12-1115) as moot.

## I.   **BACKGROUND**

### A.   *Factual History*

We construe the facts underlying the grant of summary judgment in the light most favorable to Ms. Schneider as the non-moving party, *Ribeau v. Katt*, 681 F.3d 1190, 1194 (10th Cir. 2012), and recount those facts as follows.

1.  **Officer Coyne's Response to Ms. Schneider's 911 Call**

In the early evening of September 27, 2009, Ms. Schneider called 911 to report an altercation with her teenage son. Officer Coyne and another officer responded around 7:00 p.m. While at Ms. Schneider's home, they discovered that her son was making and detonating bombs and recording the explosions on his cell phone. Officer Coyne explained to Ms. Schneider that, far from a slap on the wrist for a teenage prank, her son could be facing very serious charges. Had her son been an adult, he said, the seriousness of his offense would be a class 4, falling somewhere between Charles Manson as a class 1 and the head of a methamphetamine ring as a class 6. Officer Coyne returned to the station, but he came back to Ms. Schneider's house two more times that night — first, at around 11:00 p.m., to collect more evidence; and second, around midnight, to return some property (his shift schedule was from 3:00 p.m. until 1:00 a.m.).

The next day, September 28, Officer Coyne called Ms. Schneider with some questions for his investigation. She asked him to update her on the case, telling him that she was very concerned. Officer Coyne said he was aware that she was having issues with her son, and he offered to stop by and check on him later. Ms. Schneider accepted the offer. She and Officer Coyne exchanged calls multiple times throughout the day, and she spoke with him once more in an after-dinner conversation about her son.

- 4 -

2. **Officer Coyne's Rape of Ms. Schneider**

Although Officer Coyne was scheduled to work until 1:00 a.m. on September 29, he signed off-duty at 11:49 p.m. on September 28. He then went to Ms. Schneider's house.[1] She was awake and packing for a move; the doors were unlocked and open. Wearing a sweatshirt with his uniform pants and boots, but not wearing a badge or carrying a weapon, Officer Coyne entered the house without knocking or asking permission. He startled Ms. Schneider because she was not expecting him to visit that night. He began talking with her about her son and the case investigation.

Then Officer Coyne made the conversation more personal, mentioning her estranged husband. Further, he made remarks to the effect of "'you never want to talk about the police because they have so many connections' or 'know so many people,'" Aplt. App., Vol. 3 at 307, and "how he was 'doing [Ms. Schneider's] son a

---

[1] Ms. Schneider contends there is a genuine issue of material fact as to whether Officer Coyne was on-duty or off-duty when the rape occurred because he was scheduled to work until 1:00 a.m. on September 29 and his time sheet reflects that he was paid for that time. But GJPD's unit log for Officer Coyne shows that he signed off-duty at 11:49 p.m. on September 28. Officer Coyne's supervisor, Sergeant William Baker, testified that Officer Coyne asked to leave an hour early to go home and get more sleep before he left on vacation. The sergeant granted the request because Officer Coyne had worked an extra hour earlier in the week. Further, when Officer Coyne arrived at Ms. Schneider's home, he was not in full uniform, not wearing a badge, and not carrying a weapon. Even viewing the facts in the light most favorable to Ms. Schneider, we cannot conclude that a reasonable jury could find that Officer Coyne was on-duty after 11:49 p.m. on September 28.

favor,' or 'doing [her] a favor with [her] son,'" *id.* at 308.[2] He next overpowered

Ms. Schneider and raped her multiple times. Before leaving, he told her, "'[N]obody

can know about this. My wife can't know about this. You do not want to mess with

my life.'" *Id.* at 310. Ms. Schneider interpreted these remarks as a threat of

retaliation, either against her or through her son's case.

Despite feeling threatened, Ms. Schneider reported the rape later that same

day. The Mesa County Sheriff's Office ("MCSO") began an investigation, and a

medical examination corroborated that she had suffered trauma. Officer Coyne was

arrested on October 1, 2009, and his employment with GJPD was terminated. He

was released on bond, and within days he committed suicide.

3. **Previous Complaints Against Officer Coyne for Sexual Assault**

The attack on Ms. Schneider was the third incident in which Officer Coyne

was alleged to have had improper sexual contact with a woman whom he met while

working in law enforcement. One complaint was known to GJPD before the attack

on Ms. Schneider, but the other was not.

*a. The January 10, 2007 A.L. Complaint*

The complaint that was unknown to GJPD concerned Officer Coyne's actions

when he was working for MCSO and just before he started working for GJPD. On

---

[2] The defendants contend that Officer Coyne's statements, as reported by Ms. Schneider, are inadmissible hearsay. We disagree. The statements are not hearsay because they are not offered for the truth of the matter asserted. *See* Fed. R. Evid. 801(c) (defining hearsay).

January 10, 2007, A.L.[3] complained to MCSO that on January 8, 2007, Officer Coyne sexually abused her during a nighttime drug raid at her house. The written report of A.L.'s complaint states that all of the men in the house were arrested, but A.L. and her mother were not. During these events, Officer Coyne searched A.L. three times. The first two times were pat-downs, during which Officer Coyne rubbed and groped A.L. in her crotch area. A.L. lifted her blouse to avoid her breasts being touched. The third time, A.L. was in her bedroom. Officer Coyne came in alone, said he wanted to search her again, and told her to pull down her pants and underwear. Then another officer came in and told Officer Coyne it was time to go.

GJPD learned about A.L.'s complaint only after the assault on Ms. Schneider. GJPD's hiring background check on Officer Coyne was completed in December 2006 and was not updated through his January 15, 2007 start date. The A.L. incident occurred during this interim period. No one at MCSO informed GJPD about A.L.'s complaint until after Ms. Schneider reported her assault on September 29, 2009.

b. *The December 28, 2008 V.W. Complaint*

The complaint that was known to GJPD occurred nearly two years into Officer Coyne's employment at GJPD. V.W. reported on December 28, 2008, that she had met Officer Coyne when she sought police assistance in November 2008 because she was intoxicated and hallucinating. She contacted him on December 19 and agreed to

---

[3] We have chosen not to use the full names of the nonparties to this case who complained about Officer Coyne.

his suggestion that he visit her at home when he was off-duty. He came to her home on that same day. They engaged in consensual sex, but he allegedly took the encounter beyond her consent and sexually assaulted her.

After receiving V.W.'s complaint, GJPD put Officer Coyne on administrative leave. MCSO conducted a criminal investigation. The district attorney declined to bring charges because the evidence was equivocal. According to the deputy district attorney, V.W. was not a reliable witness, she admitted that the encounter began consensually, and the medical evidence was inconclusive. Further, in addition to asserting that all the activities were consensual, Officer Coyne passed a polygraph test to that effect. GJPD subsequently conducted an internal investigation, which was kept confidential. As a result of the internal investigation, which also determined that proof of sexual assault was inconclusive, Police Chief William Gardner placed Officer Coyne on probation for at least six months and cut his pay, and Deputy Chief John Zen issued him a written notice of discipline.

After the V.W. investigation, Officer Coyne was transferred to a new supervisor, Sergeant William Baker, who was told that Officer Coyne was on probation. When Sergeant Baker asked his commander why Officer Coyne had been on administrative leave, he was told that the matter was confidential pursuant to GJPD policy. In light of the policy, Sergeant Baker did not inquire further. He therefore had no knowledge of V.W.'s complaint. He stated in an affidavit filed in

this litigation that he supervised Officer Coyne in the same manner as the other officers assigned to report to him.

Officer Coyne was still on probation at the time he met Ms. Schneider.

## B.  *Procedural History*

Ms. Schneider sued GJPD for municipal liability and several GJPD officials in their individual capacities for how they discharged their superintendent responsibilities.  The individual defendants were Chief Gardner, who was the police chief until the beginning of September 2009; John Camper, who became the interim police chief upon Chief Gardner's departure; Deputy Chief Zen; Sergeant Baker, who was Officer Coyne's direct supervisor at the time of the rape; and Rick Dyer, GJPD's Professional Standards Administrator ("PSA").  Ms. Schneider alleged that various combinations of the defendants were liable for inadequate hiring, training, investigation of the V.W. complaint, discipline, and supervision.

The defendants moved for summary judgment.  They argued that (1) Officer Coyne had not acted under color of state law; (2) the individual defendants were entitled to qualified immunity; (3) Ms. Schneider could not prove that any of the individual defendants caused Officer Coyne's conduct and/or acted with deliberate indifference to the risk of what happened to her; and (4) the City was not liable because Ms. Schneider could not prove her claims against the individual defendants, the City had no policy or custom that was the moving force behind Ms. Schneider's

injury, and the City did not act with deliberate indifference. Ms. Schneider responded in opposition, submitting numerous exhibits.

The district court concluded that Ms. Schneider's evidence created a genuine issue of material fact as to whether Officer Coyne acted under color of state law, and denied the defendants' request for summary judgment on that ground. The court nonetheless held that the defendants were entitled to summary judgment. It identified two primary issues: (1) causation, and (2) the required culpable state of mind of deliberate indifference for a substantive due process bodily integrity claim. Analyzing each of Ms. Schneider's five claims, the court concluded she had insufficient evidence to show that the alleged inadequacies caused the rape and/or that the individual defendants or the City were deliberately indifferent to the risk of Officer Coyne's committing a rape. Accordingly, the district court granted summary judgment to all of the defendants.

Ms. Schneider appealed. The defendants cross-appealed on the color of state law issue.

## II. **DISCUSSION**

This court reviews a grant of summary judgment de novo, viewing the evidence in the light most favorable to Ms. Schneider. *See Ribeau*, 681 F.3d at 1194. "'The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). "A fact is material if, under the

governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013) (internal quotation marks omitted).

"[T]he burden on the moving party may be discharged by 'showing'---that is, pointing out to the district court---that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (alteration and internal quotation marks omitted); *see also Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) ("If the movant carries this initial burden, the non-movant may not rest upon its pleadings, but must set forth specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)).

A. *Ms. Schneider's Appeal, No. 12-1086*

1. **Legal Standards for Individual and Municipal Liability**

*a. Individual Liability*

The individual defendants were Officer Coyne's supervisors. We have referred to claims against supervisors as based on "supervisory liability," *see, e.g.*, *Meade v. Grubbs*, 841 F.2d 1512, 1527 (10th Cir. 1988), though this label can be

misunderstood as implying vicarious liability. "Section 1983 does not authorize liability under a theory of respondeat superior." *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011).[4] For this reason, the Supreme Court has suggested the term "supervisory liability" is "a misnomer." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.*

The plaintiff therefore must show an "affirmative link" between the supervisor and the constitutional violation. *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010). This requires, for example, more than "a supervisor's mere knowledge of his subordinate's" conduct. *See Iqbal*, 556 U.S. at 677. This notion is embodied in the three elements required to establish a successful § 1983 claim against a defendant based on his or her supervisory responsibilities: (1) personal involvement; (2) causation, and (3) state of mind. As we explained in *Dodds*:

> [T]he plaintiff must demonstrate an affirmative link between the supervisor and the violation[.] Over time, this "affirmative link" requirement came to have three related prongs: (1) personal involvement; (2) sufficient causal connection, and (3) culpable state of mind.

614 F.3d at 1195 (quotations omitted). We discuss each of these elements in turn.

---

[4] This opinion discusses three cases that properly can be short-cited as "*Brown*." To avoid confusion, we reserve "*Brown*" for the Supreme Court case discussed later in this opinion, *Board of County Commissioners v. Brown*, 520 U.S. 397 (1997).

i. Personal involvement

"Individual liability under § 1983 must be based on [the defendant's] personal involvement in the alleged constitutional violation." *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997). Before the Supreme Court's decision in *Iqbal*, this circuit allowed a plaintiff to establish personal involvement in several ways, for example, "by demonstrating [a defendant's] personal participation, his exercise of control or direction, or his failure to supervise." *Dodds*, 614 F.3d at 1195 (internal quotation marks omitted). "A defendant supervisor's promulgation, creation, implementation, or utilization of a policy that caused a deprivation of plaintiff's rights also could have constituted sufficient personal involvement." *Id.* (citing *Meade*, 841 F.2d at 1528).

*Iqbal*, however, articulated a stricter liability standard for this first element of personal involvement. *See Dodds*, 614 F.3d at 1199. In *Iqbal*, the Supreme Court explained that "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." 556 U.S. at 676.

"[W]e have not yet had occasion to determine what allegations of personal involvement . . . meet *Iqbal*'s stricter liability standard." *Dodds*, 614 F.3d at 1199. We have discussed this question in several recent cases. *See Wilson v. Montano*, __ F.3d __, No. 12-2051, 2013 WL 1848138, at *6-*8 (10th Cir. May 3, 2013); *Keith v. Koerner*, 707 F.3d 1185, 1188 (10th Cir. 2013); *Brown v. Montoya*, 662 F.3d at

- 13 -

1164-66; *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010); *Dodds*, 614 F.3d at 1198-1201.

None of those cases, however, presented us with the occasion to address the precise contours of this standard. And neither does this case. None of the claims against the individual defendants turns on the question of personal involvement. The district court's summary judgment conclusions were based on the second and third elements, causation and state of mind, and the parties' arguments also are focused on these latter elements. We therefore assume without deciding that Ms. Schneider has presented sufficient evidence of the individual defendants' personal involvement under *Iqbal's* stricter liability standard.

### ii. Causation

The second element requires the plaintiff to show that the defendant's alleged action(s) caused the constitutional violation. As we said in *Dodds*, nothing in *Iqbal* "altered the Supreme Court's previously enunciated § 1983 causation . . . analysis." *Dodds*, 614 F.3d at 1200. "A plaintiff [must] establish the 'requisite causal connection' by showing 'the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights." *Id.* at 1185 (quoting *Poolaw v. Marcantel*, 565 F.3d 721, 732-33 (10th Cir. 2009)); *see also Starr v. Baca*, 652 F.3d 1202, 1218 (9th Cir. 2011) ("The requisite causal connection can be established [] by setting in motion a series of acts by others which the actor knows or reasonably should know

would cause others to inflict the constitutional injury." (internal quotation marks omitted)), *cert. denied*, 132 S. Ct. 2101 (2012).

For example, in *Poolaw*, a plaintiff brought a § 1983 claim against two police supervisors involving a police search of the plaintiff's home. 565 F.3d at 726-27. We determined that the search was not supported by probable cause and therefore violated plaintiff's Fourth Amendment rights. *Id.* at 732. The police supervisors were not present during the search, but they ordered the search and swore out the affidavit in support of the search warrant. *Id.* at 733. We concluded that the supervisors' actions "set in motion a series of events" they reasonably should have known would result in the search. *Id.* The plaintiff therefore satisfied the causation element for summary judgment purposes. *Id.*

### iii. State of mind

The third element requires the plaintiff to show that the defendant took the alleged actions with the requisite state of mind. Precisely what state of mind is required for individual liability depends on the type of claim a plaintiff brings. *See Iqbal*, 556 U.S. at 676; *Dodds*, 614 F.3d at 1204-05. Ms. Schneider asserts a violation of her right to bodily integrity, which is a substantive-due-process claim. *See Abeyta ex rel. Martinez v. Chama Valley Indep. Sch. Dist., No. 19*, 77 F.3d 1253, 1255 (10th Cir. 1996). In the district court, the parties agreed that the applicable state of mind for a substantive due process claim is deliberate indifference, and the district court employed that standard.

- 15 -

On appeal, no one challenges the use of the deliberate-indifference standard. We therefore assume without deciding that deliberate indifference is the applicable state of mind. This is consistent with our approach in *Dodds*, which also concerned a substantive due process § 1983 claim, where we declined to consider whether deliberate indifference was the correct standard because neither party challenged the district court's use of that standard. 614 F.3d at 1205. We assumed without deciding, as we do here, that deliberate indifference is the standard for a claim of violation of substantive due process. *Id.*

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997). Deliberate indifference can be satisfied by evidence showing that the defendant "knowingly created a substantial risk of constitutional injury." *Dodds*, 614 F.3d at 1206. "[A] local government policymaker is deliberately indifferent when he deliberately or consciously fails to act when presented with an obvious risk of constitutional harm which will almost inevitably result in constitutional injury of the type experienced by the plaintiff." *Hollingsworth v. Hill*, 110 F.3d 733, 745 (10th Cir. 1997) (internal quotation marks omitted).

### b. Municipal Liability

In contrast to individual supervisor liability, we have explained that nothing in *Iqbal* changed the "longstanding interpretation" of § 1983's standards for imposing

municipal liability. *Dodds*, 614 F.3d at 1202. That interpretation dates back to *Monell v. Department of Social Services*, 436 U.S. 658, 691-92, 694 (1978), which held that a plaintiff must identify "a government's policy or custom" that caused the injury. In later cases, the Supreme Court required a plaintiff to show that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury. *See Brown*, 520 U.S. at 403; *see also City of Canton v. Harris*, 489 U.S. 378, 389 (1989). We briefly discuss each of the three elements: (1) official policy or custom, (2) causation, and (3) state of mind.

       i. <u>Official policy or custom</u>

In *Monell*, the Supreme Court stated that "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." 436 U.S. at 691. "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694.

"The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986). A challenged practice may be deemed an official policy or custom for § 1983 municipal-liability purposes if it is a formally promulgated policy, a well-settled

custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision. *See* Martin A. Schwartz, *Section 1983 Litigation Claims & Defenses*, § 7.06[A] (2013), available at Westlaw SNETLCD.

As with the personal involvement element of the claims against the individual defendants, we do not rely on the element of a municipal policy or custom to resolve Ms. Schneider's claims against the City. The district court assumed without deciding that this element was met, and based its summary judgment decisions in favor of the City on the second and/or third elements – causation and state of mind. We similarly assume without deciding that Ms. Schneider has presented sufficient evidence of a municipal policy or custom for her claims against the City.

> ii. Causation

To establish the causation element, the challenged policy or practice must be "closely related to the violation of the plaintiff's federally protected right." Schwartz, at § 7.12[B]. This requirement is satisfied if the plaintiff shows that "the municipality was the 'moving force' behind the injury alleged." *Brown*, 520 U.S. at 404.

Ms. Schneider must therefore "demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* As with so-called supervisory liability discussed above, municipal liability in a § 1983 case cannot be established on a theory of vicarious liability. "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an

employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id.* at 405. "The causation element is applied with especial rigor when the municipal policy or practice is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate training, supervision, and deficiencies in hiring." Schwartz, at § 7.12.

### iii. State of mind

"[A] plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Brown*, 520 U.S. at 407; *see also City of Canton*, 489 U.S. at 389.

> The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. In most instances, notice can be established by proving the existence of a pattern of tortious conduct. In a narrow range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction[.]

*Barney*, 143 F.3d at 1307 (citations and internal quotation marks omitted).[5]

---

[5] In the present case, the state-of-mind element is deliberate indifference for both the individual defendants and the City. This may not always be the case. For individual defendants, the applicable state of mind will depend on the type of

(continued)

2.  **Analysis of Ms. Schneider's Claims**

Ms. Schneider alleged inadequacies in hiring, training, investigating the V.W. complaint, discipline, and supervision. We address each claim in turn, keeping in mind that we assume for the sake of discussion that the individual defendants all meet the post-*Iqbal* personal involvement element for liability.

*a.  Hiring*

Ms. Schneider asserted her hiring claim against PSA Dyer and the City, arguing that Officer Coyne would not have been hired had there been an adequate background investigation.[6] She identified two deficiencies.

First, she complained that the background investigation was completed and submitted in December 2006 and did not continue through Officer Coyne's January 15, 2007 start date with GJPD. If it had continued, PSA Dyer would have discovered the A.L. complaint. Chief Gardner made the ultimate hiring decision, and he testified

---

constitutional violation at issue. *See Iqbal*, 556 U.S. at 676; *Dodds*, 614 F.3d at 1204-05; Schwartz, at § 6.02[A]. In contrast, the prevailing state-of-mind standard for a municipality is deliberate indifference regardless of the nature of the underlying constitutional violation. *See* Schwartz, at § 6.02[C] ("Since the decision in *City of Canton* [adopted deliberate indifference for training claims], deliberate indifference has become the prevailing standard for other types of municipal liability claims as well . . . . [W]hen a § 1983 claimant seeks to impose municipal liability she must normally show deliberate indifference."); *id.* at § 7.07 ("The deliberate indifference standard has . . . played a pervasive role in the law of § 1983 municipal liability.").

[6] Even though Chief Gardner made the hiring decision, Ms. Schneider did not assert her hiring claim against him.

at his deposition that if he had known about the A.L. complaint, he would have delayed and/or terminated Officer Coyne's hiring.

Second, Ms. Schneider complained that the investigation did not secure Officer Coyne's records from his previous employment at the Florida Department of Environmental Protection (FDEP). She asserted that those records show that he was the subject of an internal investigation for "Conduct unbecoming a public employee," with a finding of "Not Sustained." Aplt. App., Vol. 4 at 642.

This claim against both defendants fails for lack of evidence sufficient to establish deliberate indifference.

### i. Individual Defendant

In *Brown*, the Supreme Court discussed the standards for evaluating whether a policymaker's hiring decision reflects deliberate indifference:

> A plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision. Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute "deliberate indifference."

520 U.S. at 411. *Brown* addressed the proof necessary to show deliberate indifference when the background investigation was inadequate. *See id.* at 401, 411. Here, however, the record does not support a finding that the background investigation of Officer Coyne was inadequate.

- 21 -

The investigation addressed Officer Coyne's professional and personal background. On the professional side, the investigating sergeant contacted MCSO. He spoke with three employees there who were familiar with Officer Coyne, and he reviewed Officer Coyne's personnel file. He also contacted two former employers, the Santa Rosa County (Florida) Sheriff's Office and the FDEP. The Santa Rosa County Sheriff's Office gave a favorable report of Officer Coyne, while the FDEP did no more than verify Officer Coyne's employment, stating that the FDEP's employment information was confidential.

On the personal side, the sergeant conducted a home visit, reviewed Officer Coyne's personal history statement, and contacted his personal references. The one reference who responded gave a positive report of Officer Coyne. Further, the sergeant performed a criminal-history check, which showed no criminal history or law enforcement contacts, and he reviewed a psychological suitability report. The sergeant concluded that Officer Coyne was eligible for employment.

Neither of the faults alleged by Ms. Schneider made the investigation inadequate. First, as to concluding the background investigation before Officer Coyne's start date, some lag time between the completion of the investigation and a candidate's start date is not unreasonable. Here, the gap was three weeks, and the investigation stated that "it appear[ed] that Coyne has generally been a good, dependable employee." Aplt. App. Vol. 4 at 639. In the absence of any information to the contrary (such as actual notice of the A.L. complaint), it was not deliberate

- 22 -

indifference for PSA Dyer to conclude the investigation shortly before Officer Coyne's start date.

Second, regarding the FDEP records, the sergeant contacted the FDEP and was told that its records were confidential. It was not deliberate indifference for PSA Dyer to abide by the FDEP's decision not to provide its records.

For these reasons, we agree with the district court that no reasonable jury could conclude that PSA Dyer was deliberately indifferent to the risk that Officer Coyne would violate an individual's constitutional right to bodily integrity.

### ii. The City

The Supreme Court has emphasized:

> Cases involving constitutional injuries allegedly traceable to an ill-considered hiring decision pose the greatest risk that a municipality will be held liable for an injury that it did not cause. In the broadest sense, every injury is traceable to a hiring decision. Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability.

*Brown,* 520 U.S. at 415.

The evidence indicates that PSA Dyer was *not* a policymaker or decisionmaker for the City with regard to hiring Officer Coyne. He did not make the hiring decision—Chief Gardner did. Consequently, the hiring claim against the City must be based on Chief Gardner's actions or inactions. As discussed above, the background investigation was not inadequate, and, as with PSA Dyer, there is no evidence that Chief Gardner was deliberately indifferent. *See id.*, 520 U.S. at 415-16 (stating that the county was not liable for the sheriff's hiring decision because the

- 23 -

plaintiff had not shown that the sheriff acted with deliberate indifference). Moreover, no evidence suggested that the City had actual or constructive notice of the need for any additional background investigation. *See Barney*, 143 F.3d at 1307 ("The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm."). Accordingly, we agree with the district court that no reasonable jury could find that the City acted with deliberate indifference in its decision to hire Officer Coyne.

### b. Training

The defendants named in the training claim were Chief Gardner, Interim Chief Camper, Deputy Chief Zen, Sergeant Baker, and the City. Ms. Schneider argues that GJPD should have trained its officers not to have sexual relationships with women they meet in the course of doing their jobs.

The claim against the individual defendants is waived and the claim against the City fails for a lack of evidence of deliberate indifference.

#### i. Individual Defendants

Ms. Schneider provided no argument in her opening brief as to how the district court erred in granting summary judgment in favor of the individual defendants on this claim. "[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief. . . .

- 24 -

Stated differently, the omission of an issue in an opening brief generally forfeits appellate consideration of that issue." *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007). We therefore decline to address the issue here. That leaves the City as the only remaining defendant for the training claim.

### ii. The City

"[T]here are limited circumstances in which an allegation of a 'failure to train' can be the basis for [municipal] liability under § 1983." *City of Canton*, 489 U.S. at 387. "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388. A municipality can be liable where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390.

Ms. Schneider has failed to show, as the law requires, that "the need for more or different training [was] so obvious" that a violation of her constitutional right to bodily integrity was likely to result from not providing it. She argues that "the GJPD fostered a culture where officers commonly engaged in sexually oriented contact with women who the[] officer met while on duty." Aplt. Opening Br. at 51. Some of the conduct Ms. Schneider points to, however, occurred in consensual relationships, which would not amount to constitutional violations.

- 25 -

As for non-consensual sexual misconduct by GJPD officers, the record reflects that before the assault on Ms. Schneider, and besides the V.W. complaint, there was only one other report of non-consensual sexual misconduct. That officer was placed on administrative leave and resigned before the investigation process was completed. Although this report of police misconduct along with the V.W. complaint are troubling, they were not enough to make it obvious to GJPD that officers were likely to engage in non-consensual sexual conduct unless they were trained not to engage in any sexual relationship with women whom they met while on the job. As we stated in analogous circumstances, "[s]pecific or extensive training hardly seems necessary for a jailer to know that sexually assaulting inmates is inappropriate behavior." *Barney*, 143 F.3d at 1308; *see also Andrews v. Fowler*, 98 F.3d 1069, 1077 (8th Cir. 1996) ("In light of the regular law enforcement duties of a police officer, we cannot conclude that there was a patently obvious need for the city to specifically train officers not to rape young women.").

Moreover, Officer Coyne was, in fact, instructed against relationships with women he met on duty. As discussed below in connection with Ms. Schneider's discipline claim, the notice of discipline he received as a result of the V.W. complaint told him that it was unacceptable to engage in sexual relationships with women whom he met through his job. Given that he acted in violation of this direct warning, it is unclear how the training advocated by Ms. Schneider would have prevented the assault on her. Indeed, the directive issued to Officer Coyne was the opposite of

- 26 -

deliberate indifference. *See Porro*, 624 F.3d at 1328-29 (given that officer knowingly acted contrary to policy, "any reasonable fact finder would have to conclude that—far from exhibiting deliberate indifference . . . or causing his injury—the county actively sought to protect [plaintiff's] rights and it was (only) [defendant's] improper actions, taken in defiance of county policy, that caused [plaintiff's] injuries").

We agree with the district court that Ms. Schneider cannot show that the City acted with deliberate indifference to the risk of what happened to her in the manner it trained its officers.

### c. Investigation of V.W. Complaint

The defendants named in this claim were Chief Gardner, Deputy Chief Zen, PSA Dyer, and the City. PSA Dyer conducted the internal investigation of V.W.'s complaint alleging that Officer Coyne sexually assaulted her following consensual sex. Ms. Schneider alleged that the internal investigation was inadequate because PSA Dyer did not update the background check from when Officer Coyne was hired. She argues that, had he updated the hiring background check and/or obtained MCSO's complete personnel file, the A.L. complaint would have been revealed. In turn, Chief Gardner testified at his deposition that if he had learned of the A.L. complaint during the V.W. investigation, he would have dismissed Officer Coyne. Therefore, Ms. Schneider contends, if PSA Dyer had performed a more thorough investigation, Officer Coyne would not have been in a position to attack her. She

further asserts that Chief Gardner ratified PSA Dyer's decision not to update the earlier background investigation.

The claim against Deputy Chief Zen is waived, and the claims against the other individual defendants and the City fail for lack of evidence of deliberate indifference.

### i. Individual Defendants

Ms. Schneider has not argued on appeal how the district court erred in granting judgment in favor of Deputy Chief Zen on this claim, and thus we do not consider the allegations against him. *See Bronson*, 500 F.3d at 1104. That leaves the allegations against Chief Gardner and PSA Dyer.

PSA Dyer communicated numerous times with the MSCO officer in charge of the criminal investigation into V.W.'s allegations of sexual assault against Officer Coyne. He also did other preliminary work, such as reviewing Officer Coyne's e-mail messages and telephone calls for anything relevant to the V.W. complaint, and he sat in on the MSCO officer's interview of Officer Coyne. By the time he did the internal investigation, PSA Dyer had a copy of the entire criminal file compiled by MSCO and had been briefed by the investigating officer and deputy district attorney regarding their analyses of the criminal investigation. PSA Dyer also separately interviewed Officer Coyne.

Consistent with our analysis of the hiring claim, PSA Dyer's failure to update the 2006 background investigation did not make the internal investigation of the

V.W. complaint inadequate. The MSCO conducted the criminal investigation regarding the V.W. complaint, yet the A.L. complaint did not come to light even though MCSO had the A.L. complaint in its files. Neither PSA Dyer nor Chief Gardner had information indicating any need to update the background investigation, much less know that an obvious consequence of not updating the background investigation created a substantial risk of constitutional injury. Accordingly, we agree with the district court that a rational jury could not find that PSA Dyer or Chief Gardner acted with deliberate indifference.

ii. The City

As was the case with PSA Dyer and Chief Gardner, the City had no notice of any reason to update Officer Coyne's background investigation. The individual defendants were not deliberately indifferent, so judgment in favor of the City on a claim predicated on their decisions also was appropriate. *See Brown*, 520 U.S. at 415-16; *see also Brown v. Gray*, 227 F.3d 1278, 1289 (10th Cir. 2000) (stating that to proceed with municipal liability claim, "the plaintiff must show that a policymaker, which could be the chief of police, among others, was deliberately indifferent").[7]

---

[7] In addition, PSA Dyer is not a policymaker for the City. In seeking to impose municipal liability, Ms. Schneider contends that Chief Gardner ratified PSA Dyer's decision not to update the background investigation. "However, a municipality will not be found liable under a ratification theory unless a final decisionmaker ratifies an employee's specific unconstitutional actions, as well as the basis for these actions." *Bryson v. City of Okla. City*, 627 F.3d 784, 790 (10th Cir. 2010). Given that PSA Dyer's actions were not unconstitutional, Chief Gardner's alleged ratification of those actions does not impose liability on the City.

- 29 -

*d. Discipline*

Ms. Schneider asserted her discipline claim against Chief Gardner,

Deputy Chief Zen, PSA Dyer, and the City.

After the criminal investigation and internal investigation of the V.W.

complaint, Chief Gardner met with Deputy Chief Zen and PSA Dyer to consider

appropriate discipline of Officer Coyne. Chief Gardner was the final decisionmaker.

In his affidavit submitted in this litigation, he explained:

> 16. Although it was an extremely difficult decision, I ultimately decided that Coyne's conduct reflected bad judgment and he should be disciplined for engaging in conduct unbecoming of a police officer and that reflected unfavorably on the GJPD, and for failing to obey all City and Department regulations. . . .
>
> 17. I decided that the appropriate discipline was to place Coyne back on probationary status, rather than terminate him. This would allow Coyne to be terminated for any questionable conduct, in other words, he could be terminated for no cause. . . .

Aplt. App., Vol. 1 at 123. In addition, he cut Officer Coyne's pay by ten percent.

Ms. Schneider contends that instead of imposing this intermediate discipline,

Chief Gardner should have dismissed Officer Coyne and that the failure to do so led

to her rape.

The claims against Deputy Chief Zen and PSA Dyer are waived, and the

claims against Chief Gardner and the City fail for lack of deliberate indifference.

- 30 -

### i.  Individual Defendants

On appeal, Ms. Schneider has failed to challenge the judgment in favor of Deputy Chief Zen and PSA Dyer on the discipline claim, so we need not discuss the allegations against them.  *See Bronson*, 500 F.3d at 1104.

Turning to Chief Gardner, the district court gave Ms. Schneider the benefit of the doubt regarding causation.  But it held there was no showing that Chief Gardner was deliberately indifferent because "Chief Gardner was presented with Officer Coyne's apparently clean record and a single *off-duty* incident with both parties admitting to some consensual sexual contact, disputed non-consensual sexual activity, ambiguous physical evidence and a polygraph test showing no deception with respect to the disputed facts."  Aplt. App., Vol. 5 at 1083.  We agree that Chief Gardner's disciplinary decision did not reflect deliberate indifference.

As the district court noted, the evidence regarding the V.W. complaint was equivocal.  The court explained that the medical evidence was inconclusive, V.W. was an unreliable witness who admitted that the encounter began consensually, and the deputy district attorney determined there was insufficient evidence for a criminal conviction.  Officer Coyne maintained that the entire encounter was consensual, and he passed a polygraph test to that effect.  It is only in hindsight, with knowledge of the assaults on Ms. Schneider and A.L., that the scales may have tipped in favor of V.W.'s version of events.  Whether Chief Gardner acted with deliberate indifference must be based on what he knew then, not what is known now.

Other circuits have held that disciplinary decisions in similar circumstances were not made with deliberate indifference. *See DiRico v. City of Quincy*, 404 F.3d 464, 469 (1st Cir. 2005) (a city's decision not to take action against an officer based on one unsubstantiated allegation of excessive force did not constitute deliberate indifference); *Rogers v. City of Little Rock*, 152 F.3d 790, 800 (8th Cir. 1998) (police chief responded adequately to two incidents of prior misconduct by imposing suspension in the one case that was sustained, so he was not deliberately indifferent to future risk); *Jones v. Wellham*, 104 F.3d 620, 626-27 (4th Cir. 1997) (where evidence was insufficient for criminal prosecution in prior incident, chief's disciplinary decisions were "clearly unfortunate," perhaps "imprudent," or even "legally negligent," but not deliberately indifferent); *Gonzalez v. Ysleta Indep. Sch. Dist.*, 996 F.2d 745, 762 (5th Cir. 1993) (school board was not deliberately indifferent in transferring teacher rather than terminating employment, where teacher was accused of molestation but there was no corroborating evidence).

Further, as the district court also noted, Chief Gardner took the V.W. complaint seriously. He disciplined Officer Coyne with a pay cut and probation, and the resulting notice of discipline issued by Deputy Chief Zen[8] told Officer Coyne that his conduct was unacceptable:

---

[8] Chief Gardner determined the discipline for Officer Coyne. Deputy Chief Zen issued the notice of discipline, which Chief Gardner reviewed and approved prior to issuance.

First and foremost you are always a peace officer[.] . . . You knew or should have known that [V.W.] was vulnerable. There simply is no justification for your engaging in a relationship with her.

. . . Your behavior and the selfishness of it are astounding.

. . . Your behavior in this matter calls in to question your judgment and you[r] ethics. . . . [Y]our lapse in judgment and failure to exercise critical decision making, by consciously pursuing a relationship with a person you knew or should have known as being vulnerable, is shameful.

. . . Let this letter serve as a clear warning that should this type of behavior occur again, the trust I [Deputy Chief Zen] have in you will be irreparably damaged and there is no place in this department for someone I cannot trust.

Aplt. App., Vol. 4 at 685, 687, 688.

We agree with the district court that summary judgment is proper because there is no evidence that Chief Gardner disciplined Officer Coyne with deliberate indifference.

ii. The City

The discipline claim against the City is based on Chief Gardner's disciplinary decision. Rarely if ever is "the failure of a police department to discipline in a specific instance . . . an adequate basis for municipal liability under *Monell*," *Butler v. City of Norman*, 992 F.2d 1053, 1056 (10th Cir. 1993) (internal quotation marks omitted). Having concluded that Chief Gardner did not act with deliberate indifference in choosing a lesser discipline than dismissal, we also affirm judgment in favor of the City on the discipline claim. *See Brown*, 520 U.S. at 415-16*; see also Brown v. Gray*, 227 F.3d at 1289.

- 33 -

### e. Supervision

Ms. Schneider's supervision claim named Chief Gardner, Interim Chief Camper, Deputy Chief Zen, Sergeant Baker, and the City. This claim focuses on how two GJPD policies—the Confidentiality Policy and the Command Staff Review Policy—were applied to the V.W. complaint.

The first relevant policy is the Confidentiality Policy, which provides that "[a]n Internal Affairs Investigation shall be kept strictly confidential as provided by applicable procedure and law." Aplt. App., Vol. 3 at 560.

> Per standing orders of the Chief of Police, if any employee is the subject of or a witness in an Internal Affairs Investigation, the employee shall not discuss any facts, details, circumstances, procedures, or any other information about the complaint or the investigation with any person except as allowed by policy or law.

*Id.* (emphasis omitted). In his deposition, Chief Gardner confirmed that he has always directed his staff to keep the specifics of an investigation confidential. When asked why, he responded, "[n]umber one, it's for the liberty interests of the affected employee. And then to maintain integrity of our investigative process." *Id.* at 397. He also stated that confidentiality was "a general police professional conduct" and that "employees, victims, witnesses deserve the respect of confidentiality." *Id.*

The second policy pertinent to this claim is the Command Staff Review ("CSR") Policy. The CSR Policy provides that upon completion of an internal investigation, the deputy chief will convene a CSR "to review and discuss the [investigation] reports and supporting documentation." *Id.* at 565. "The CSR shall

- 34 -

be responsible for recommending a disposition of any alleged violation(s) of Department/City policy or procedures and any disciplinary action(s) or sanction(s)." *Id.* The supervisor of the subject of the investigation participates in the CSR review. In this case, what is relevant about the CSR is not the CSR Policy itself, but an unwritten custom at GJPD of not holding a CSR in matters involving sexual misconduct. In explaining this custom, Deputy Chief Zen said, "an incident involving marital indiscretion . . . having an affair, these sorts of things . . . didn't necessarily need to be put out into the public in the form of a command staff review." *Id.* at 419. Consistent with this practice, Chief Gardner and Deputy Chief Zen decided not to convene a CSR following the investigation of the V.W. complaint.[9]

Pursuant to the Confidentiality Policy and the CSR custom, the internal investigation of the V.W. complaint was kept confidential, even from Officer Coyne's new supervisor, Sergeant Baker. The sergeant knew that Officer Coyne was on probation, but not why he had been disciplined. His request

---

[9] It is not clear that the GJPD's custom of forgoing a CSR on allegations of "sexual misconduct" would apply to V.W.'s allegations, which were far more serious than the type of behavior Deputy Chief Zen referenced as falling under the custom, such as "marital indiscretion." Aplt. App., Vol. 3 at 419. V.W.'s complaint that Officer Coyne committed a non-consensual sexual assault alleged a criminal act. The investigation determined that proof of this allegation was inconclusive, and Officer Coyne was disciplined only for having a consensual sexual relationship with V.W. Whether or not a CSR would have been held in this instance had it been treated as involving a non-consensual sexual assault does not affect the outcome of this appeal.

for further information was denied on the ground that GJPD policy required the information to be kept confidential.

Although we are troubled that Officer Coyne's supervisor was not informed of the V.W. complaint, we affirm the summary judgment in favor of the defendants for lack of sufficient evidence of causation.

### i. Individual Defendants

"Section 1983 imposes liability on a government official who 'subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights.'" *Martinez v. Carson*, 697 F.3d 1252, 1255 (10th Cir. 2012) (quoting § 1983). Like deliberate indifference, causation is an element of Ms. Schneider's § 1983 claims. *See id.* at 1255; *Dodds*, 614, F.3d at 1199. Causation is generally a question of fact for the jury. *See* Schwartz, at § 6.03[A][1]. But whether the plaintiff has presented sufficient evidence of causation to defeat a motion for summary judgment is a legal question. *See Henry v. Merck & Co., Inc.*, 877 F.2d 1489, 1495 (10th Cir. 1989); *see also June v. Union Carbide Corp.*, 577 F.3d 1234, 1253 (10th Cir. 2009) (Holloway, J. concurring and dissenting) (collecting authorities).

As we have already explained, "causal connection is satisfied if Defendants set in motion a series of events that Defendants knew or reasonably should have known would cause others to deprive Plaintiffs of their constitutional rights." *Martinez*, 697 F.3d at 1255 (alterations and internal quotation marks omitted).

The premise of Ms. Schneider's supervision claim is that the Confidentiality Policy and the CSR custom prevented Sergeant Baker from learning about the V.W. complaint, and that if he had known of the complaint, Sergeant Baker would have supervised Officer Coyne more closely and prevented the attack on Ms. Schneider. To prevail, Ms. Schneider must show that the policy and custom set into motion a series of events that the individual defendants—Chief Gardner, Interim Chief Camper, Deputy Chief Zen, and Sergeant Baker—knew or should have known would result in Officer Coyne committing an intentional, criminal assault.

The district court determined that causation for the supervision claim "is a closer question than is apparent with regard to hiring and training. Logically, it would make sense that if Officer[] Coyne's supervisor had known about the reasons for his probation, that some restrictions might have been imposed." Aplt. App., Vol. 5 at 1078. But the district court ultimately concluded that, at the time of the attack, Officer Coyne was off-duty and not under official supervision. Therefore, "even if Officer Coyne's supervisors knew of the prior incident with [V.W.], there is no evidence that any supervision would have prevented Officer Coyne from committing an intentional, criminal assault while off-duty." *Id.*

We agree that Ms. Schneider's supervision claim is stronger than her hiring and training claims. In particular, the GJPD custom of omitting the CSR, a standard tool in GJPD's disciplinary investigations, in cases involving sexual misconduct, is concerning. The defendants' stated desire to protect the privacy of misbehaving

officers and third parties likely could have been served by other means, without relaxing the investigative process.

Nevertheless, we cannot say that Sergeant Baker's lack of knowledge of the specific details of the V.W. complaint set in motion a series of events that caused the constitutional violation. To establish this, Ms. Schneider would need to show that if Sergeant Baker had known the relevant details, he would have taken *specific* actions and that these actions would have prevented Officer Coyne's attack. She has not provided such evidence.

The evidence seems to cut the other way. If Sergeant Baker had been informed of the reason for Officer Coyne's probationary status, he would have been told that an investigation of Officer Coyne determined (1) he had consensual sex with a woman he had met while on duty and (2) proof of her allegation that the consensual sex had become non-consensual was inconclusive, based at least in part on V.W.'s credibility issues and Officer Coyne's passing a polygraph test. We cannot say that keeping these details from the sergeant put into motion a series of events that any of the individual defendants knew or should have known would result in Officer Coyne committing a violent felony.

There is no evidence the sergeant would have responded differently to this information. Ms. Schneider has not pointed to any particular action the sergeant would have taken. Nor has she shown how any particular action on the sergeant's part would have prevented his attack on Ms. Schneider. Officer Coyne was already

on probation from the V.W. investigation. He had received a pay cut and a stern warning in the notice of discipline from commanding officers more senior to him than Sergeant Baker. Yet he still committed a violent, criminal act against Ms. Schneider. There is no evidence that additional controls or sanctions from Sergeant Baker would have had any more deterrent effect than the already-present threats of discharge and criminal punishment.

Mere speculation that something would have been done to prevent Ms. Schneider's injury is not sufficient to establish causation.

### ii. The City

As with the individual defendants, to proceed against the City, Ms. Schneider must present sufficient evidence to create a genuine issue of material fact as to causation.[10] *See Monell*, 436 U.S. at 692 ("Congress did not intend § 1983 liability to attach where . . . causation was absent."); *City of Canton*, 489 U.S. at 391 (requiring the identified deficiency to "be closely related to the ultimate injury"); *Brown*, 520 U.S. at 404 (requiring the plaintiff to "demonstrate a direct causal link between the municipal action and the deprivation of federal rights"); *see also* Schwartz, at § 6.03[A][2] ("The various phrases employed by the Court . . . emphasize[] that the

---

[10] As mentioned earlier, as to Ms. Schneider's claims against the City, we have assumed without deciding the existence of a policy or custom sufficient for municipal liability. We note that the supervision claim involved a formal written GJPD policy (the Confidentiality Policy) as well as the City's custom not to hold a CSR in matters involving sexual misconduct.

§ 1983 claimant must show a close relationship between the enforcement of a municipal policy or custom and the plaintiff's injury.").[11]  For the same reasons discussed above, we agree with the district court that Ms. Schneider has failed to satisfy the burden of presenting sufficient evidence of causation on her supervision claim against the City.

## B.  *Defendants' Cross-Appeal (No. 12-1115)*

Because we have affirmed the district court's grant of summary judgment to defendants on each of Ms. Schneider's claims, we dismiss defendants' cross-appeal as moot.  *See, e.g.*, *Holmes v. Utah, Dep't of Workforce Servs.*, 483 F.3d 1057, 1070 (10th Cir. 2007) (deeming defendant's cross-appeal of discovery order to be moot when this court affirmed the district court's grant of summary judgment to defendant); *Carpenter v. Boeing Co.*, 456 F.3d 1183, 1204 (10th Cir. 2006) (dismissing defendant's cross-appeal of class certification as moot when this court affirmed the district court's grant of summary judgment to defendant).

---

[11] Schwartz further notes:

> The Supreme Court . . . has not resolved whether the § 1983 municipal liability causation requirement is equivalent to common law proximate cause or is a more rigorous standard.  There are indications that, at least for some types of municipal liability claims [including claims regarding training and hiring], the causation requirement is more rigorous than common law proximate cause.

Schwartz, at § 7.12[B].

## III.  **CONCLUSION**

Four of Ms. Schneider's claims fail on the element of culpable state of mind, and her fifth claim fails on the element of causation.  In No. 12-1086, Ms. Schneider's appeal, the grant of summary judgment to all of the defendants is therefore affirmed.  No. 12-1115, the defendants' cross-appeal, is dismissed as moot.