# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2020AP877 |

| | |
|---|---|
| COMPLETE TITLE: | Rachel Slabey, |
| |         Plaintiff-Appellant-Petitioner, |
| |    v. |
| | Dunn County, Wisconsin, Dennis P. Smith, Brenda LaForte, Marshall L. Multhauf and Paul Gunness, |
| |         Defendants-Respondents, |
| | Dunn County Sheriff's Office, Ryan Boigenzahn, John Doe One, John Doe Two and John Doe Three, |
| |         Defendants, |
| | Wisconsin County Mutual Insurance Corporation, |
| |         Intervenor. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 399 Wis. 2d 323, 964 N.W.2d 549
(year – unpublished)

| | |
|---|---|
| OPINION FILED: | January 18, 2023 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | October 10, 2022 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Dunn |
|   JUDGE: | Maureen D. Boyle |

JUSTICES:
ZIEGLER, C.J., delivered the majority opinion of the Court, in which ROGGENSACK, REBECCA GRASSL BRADLEY, DALLET, and HAGEDORN, JJ., joined. KAROFSKY, J., filed a dissenting opinion, in which ANN WALSH BRADLEY, J., joined.
NOT PARTICIPATING:

ATTORNEYS:

For the plaintiff-appellant-petitioner, there were briefs filed by *Cristina M. Wirth, Martha H. Heidt*, and *Bye, Goff & Rohde, Ltd.,* River Falls. There was an oral argument by *Cristina M. Wirth*.

For the defendants-respondents, there was a brief filed by *Samuel C. Hall, Jr., Timothy M. Johnson, Molly K. Woodford,* and *Crivello Carlson, S.C.,* Eau Claire. There was an oral argument by *Samuel C. Hall, Jr.*

An amicus curiae brief was filed by *Mark L. Thomsen, Lynn R. Laufenberg, Kimberly D. Sweatt,* and *Gingras, Thomsen & Wachs, LLP,* Madison, and *James D. Rogers* and *Wisconsin Association for Justice,* Madison, for the Wisconsin Association for Justice.

2023 WI 2

NOTICE

This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.

No. 2020AP877
(L.C. No. 2017CV277)

STATE OF WISCONSIN      :      IN SUPREME COURT

Rachel Slabey,

    Plaintiff-Appellant-Petitioner,

    v.

Dunn County, Wisconsin, Dennis P. Smith, Brenda LaForte, Marshall L. Multhauf and Paul Gunness,

    Defendants-Respondents,

Dunn County Sheriff's Office, Ryan Boigenzahn, John Doe One, John Doe Two and John Doe Three,

    Defendants,

Wisconsin County Mutual Insurance Corporation,

    Intervenor.

**FILED**

**JAN 18, 2023**

Sheila T. Reiff
Clerk of Supreme Court

---

ZIEGLER, C.J., delivered the majority opinion of the Court, in which ROGGENSACK, REBECCA GRASSL BRADLEY, DALLET, and HAGEDORN, JJ., joined. KAROFSKY, J., filed a dissenting opinion, in which ANN WALSH BRADLEY, J., joined.

---

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 ANNETTE KINGSLAND ZIEGLER, C.J. This is a review of an unpublished decision of the court of appeals, Slabey v. Dunn County, No. 2020AP877, unpublished slip op. (Wis. Ct. App.

July 7, 2021), affirming the Dunn County circuit court's[1] order granting summary judgment in favor of Dunn County on Rachel Slabey's claim under 42 U.S.C. § 1983. We affirm.

¶2 Slabey argues that her § 1983 claim against Dunn County survives summary judgment because she presented evidence sufficient for a reasonable jury to find that Dunn County[2] violated her rights under the Eighth and Fourteenth Amendments to the United States Constitution when then-Dunn County Correctional Officer Ryan Boigenzahn sexually assaulted her. According to Slabey, Dunn County is liable because the "County was deliberately indifferent to a substantial risk of harm to Slabey by failing to thoroughly investigate, appropriately discipline, and adequately supervise Boigenzahn." Slabey argues that the circuit court erroneously granted Dunn County summary judgment and that the court of appeals erred in affirming that result.

¶3 We conclude that Slabey's § 1983 claim against Dunn County fails because, under Monell v. Department of Social Services, 436 U.S. 658 (1978), no reasonable fact finder could conclude that Dunn County was the causal, moving force behind the sexual assault. A § 1983 plaintiff suing a municipality for a constitutional deprivation must prove that the municipality caused——that is, was the moving force behind——the constitutional

---

[1] The Honorable Maureen D. Boyle presided.

[2] All references to "the County" are to Dunn County unless otherwise noted.

deprivation. This requires evidence "that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 407 (1997) (quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989)). Here, there is insufficient evidence demonstrating Dunn County acted with deliberate indifference to a known or obvious consequence that Boigenzahn would sexually assault Slabey. The circuit court was correct to grant Dunn County summary judgment on Slabey's § 1983 constitutional deprivation claim. We affirm the court of appeals.

## I. FACTUAL BACKGROUND AND PROCEDURAL POSTURE

¶4 Ryan Boigenzahn began working as a correctional officer ("CO") at the Dunn County Jail in April 2011. As part of his training, Dunn County required Boigenzahn to attend the Jail Academy at Nicolet College. There, Boigenzahn took a month-long, 160-hour course where, according to Boigenzahn, he learned "what it is to be a corrections officer in the state of Wisconsin." Boigenzahn was also required to participate in the course's Prison Rape Elimination Act of 2003 ("PREA")[3] training. Boigenzahn admitted during his deposition that he "learn[ed] through that training . . . that sexual contact between inmates and prisoners was" prohibited by law. He passed the training course, and he received his certification from the Law Enforcement Standards Board in June 2012. Boigenzahn worked

---

[3] 34 U.S.C. §§ 30301-30309 (2018).

third shift at the jail as a CO, which was from 10:30 p.m. to 7:00 a.m.

¶5 Dunn County also required Boigenzahn to review and certify that he reviewed all Dunn County policies, including the County's fraternization, sexual misconduct, and PREA policies. Boigenzahn signed these policies, stating, "I certify that I have read, understand, and will comply with the policies . . . ." Dunn County's fraternization policy includes, in relevant part:

> Employees of the Dunn County Sheriff's Office shall not:
>
> a. Have a relationship with an inmate/prisoner or the spouse of an inmate/prisoner under the supervision or custody of the Dunn County Jail, for one year after their release.
>
> b. Have a relationship with individuals whom the employee knows is [sic] incarcerated in a state correctional facility or a county jail other than the Dunn County Jail, or under the supervision of the Wisconsin Department of Corrections (Probation/Parole), or for one year after their release.
>
> c. Have personal contacts that are usually one-to-one such as dating, knowingly form close friendships, correspond without an exception granted or have visits that are not job related, for a period of one year after their release.
>
> d. Accept or give gifts, provide services in exchange for work performed, for one year after their release.
>
> e. Encourage or allow to occur, the exchange of personal or departmental information between the employee and an inmate.

4

The sexual misconduct/PREA policy prohibits all staff, including COs like Boigenzahn, from engaging in sexual misconduct, which the policy defines as follows:

> Sexual Misconduct is any behavior or act of a sexual nature directed toward an inmate, detainee, victim, witness, or complainant by any employee, volunteer, vendor, contractor, visitor or agency representative.

> 1. This includes acts or attempts to commit such acts including, but not limited to, sexual assault, sexual abuse, sexual harassment, sexual contact, conduct of a sexual nature or implication, obscenity and unreasonable or unnecessary invasion of privacy.

> 2. Sexual misconduct also includes, but is not limited to, conversations or correspondence that suggests a romantic or sexual relationship involving any person mentioned above.

> 3. Sexual misconduct is not limited to unwanted sexual contact. Sexual misconduct is also a range of behaviors or situations that include inappropriate remarks, sexualized name-calling, correspondence, conversations, inappropriate displays, fondling, inappropriate viewing, and sexual contact with individuals vulnerable to the authority of the justice system or any other person in a work setting. Such acts are inappropriate in a work setting and presumed to be unwelcome.

> 4. Romantic relationships between supervisors and those under their supervision are presumed to be coercive and may be deemed sexual harassment or misconduct.

Dunn County's sexual misconduct/PREA policy also requires staff to report and investigate all alleged violations:

> A. Reporting Requirements

> 1. Any employee or staff member who knows or reasonably suspects that any employee may be or has

5

been involved in sexual misconduct is required to inform the Jail Captain. To protect the reputations and integrity of all persons engaged in such a process, including the accuser, the accused, and the alleged victim, all such reports shall be dealt with as matters of highest discretion both before and after they have been submitted to appropriate authorities.

. . . .

4. Upon receiving a report of possible sexual misconduct or harassment, the Jail Captain shall notify the Chief Deputy. The Chief Deputy shall in turn notify the Sheriff and other Command Staff as appropriate and needed.

B. Investigation

1. All reported violations of sexual misconduct, including sexual assault and harassment, will be investigated and, as warranted, will be resolved through appropriate disciplinary processes and/or criminal proceedings in accordance with applicable state and federal laws.

Dunn County requires all staff, including COs like Boigenzahn, to regularly complete policy reviews. According to Boigenzahn's training log, he completed at least eight reviews of the County's fraternization, sexual misconduct, or PREA policies. After each policy review, Boigenzahn certified that he read and understood the policy.

¶6 On July 31, 2015, a CO informed Sergeant Michael Owens that inmate J.W.B. expressed that staff needed to "keep a close eye on [the] 'male COs.'" Sergeant Owens immediately began investigating. He first interviewed J.W.B. During the interview, J.W.B. said that she observed Boigenzahn passing notes between inmates on July 28, 2015. Sergeant Owens also "asked her if one of [the] officers was developing a

6

relationship with an inmate." J.W.B. said "no, nothing like that." Sergeant Owens also reviewed surveillance footage of the alleged incident and recorded phone conversations between the inmates suspected of note-passing. He discovered no evidence of misconduct and determined "[t]he allegation [was] not supported on a factual basis." Sergeant Owens recorded the results of his investigation in a report and, according to County policy, forwarded that report to his supervisor.

¶7 On August 6, 2015, a different inmate, B.M., said to Sergeant Douglas Ormson that "she actually had a lot of respect for the staff at the Jail, except for one person who she felt was in danger of 'crossing the line.'" Sergeant Ormson asked B.M. who she was referring to and to elaborate. B.M. identified Boigenzahn and said he "was too chummy with some of the females." B.M. said she saw another inmate, A.D., "playfully slap[] Officer Boigenzahn on the chest," and that A.D. and Boigenzahn "talked quite a bit." Sergeant Ormson asked B.M. "if she felt that anything else had happened." B.M. said "she didn't think so, but she felt that if there was an opportunity where there were no cameras around she felt something might happen." B.M. also told Sergeant Ormson how "all the females in the Jail talk about that, and about [Boigenzahn's] willingness to talk to them," and how Boigenzahn "maybe liked the attention from the females." Sergeant Ormson "asked her again if she had witnessed anything sexual or even heard any rumors about that type of relationship," and B.M. said she hadn't "but again said her feeling was that was a possibility if things progressed."

7

B.M. said she "knows that there is a 'bright line' that staff aren't supposed to cross" and felt "if Officer Boigenzahn hasn't already crossed that line that he is getting dangerously close to doing it."

¶8 The next day, Sergeant Ormson discussed this matter with Sergeant Owens, who stated he heard similar allegations, and Sergeant Rachel Vold. The three decided that Sergeant Vold would review surveillance footage to investigate the allegations. Sergeant Vold reviewed two weeks of surveillance footage and found two concerning instances. On July 29, 2015, while delivering medications to inmates, Boigenzahn "playfully reach[ed] out his foot to step on [A.D.]'s foot." On August 6, 2015, again while delivering medications, Boigenzahn "gesture[d] with his head as if motioning someone to come in his direction, and also with his right arm. [A.D.] then [came] running over to him. . . . [A]s she walk[ed] away she brush[ed] him with her hand on his shoulder/chest area." Pursuant to Dunn County policy, Sergeant Vold forwarded this information to the Jail Captain on August 10, 2015. The Jail Captain told Sergeant Vold to interview A.D., which she did later that day.

¶9 During that interview, Sergeant Vold informed A.D. that "at no time should there ever be any sort of contact with an officer, male or female, whatsoever." Sergeant Vold "went on to ask [A.D.] if there [were] any instances where she felt uncomfortable [because of] any male or female officer." A.D. said that Boigenzahn made her feel uncomfortable. A.D. reported that three months prior, she and Boigenzahn "accidentally bumped

8

hands" and that A.D. "pulled her hand back, where [Boigenzahn] then responded that it was alright[;] he didn't mind." A.D. "went on to say that other female inmates . . . told her [Boigenzahn] seems to be 'obsessed' with her and that they have observed him standing and watching her sleep." Sergeant Vold asked A.D. "if there were any other instances or officers that made her feel uncomfortable, to which she responded no."

¶10 Later that same day, the Jail Captain and the Dunn County Chief Deputy interviewed Boigenzahn regarding these allegations. Boigenzahn initially denied passing notes between inmates, but he admitted to doing so once the Jail Captain and Chief Deputy reminded Boigenzahn that he could be terminated for lying. Boigenzahn said he made a "dumb mistake passing the note and it w[ould] not happen again." They also showed Boigenzahn the videos of him and A.D., but he denied that there was any inappropriate conduct. The Jail Captain and Chief Deputy further discussed "policy violations, co-worker mistrust, and inmates who now think there is a relationship between [A.D.] and CO Boigenzahn." Boigenzahn explained that he "tries to gain rapport or cooperation with inmates but now sees that he needs to be sterner."

¶11 Pursuant to Dunn County policy, the matter was then brought to the Dunn County Sheriff. Based on the results of the investigation, the Sheriff decided that Boigenzahn violated Dunn County's policies which prohibited fraternization and unbecoming conduct. The Sheriff decided to impose discipline. The available options were performance counseling, oral reprimand,

9

written reprimand, unpaid suspension, and termination. The Sheriff initially "was planning on terminating [Boigenzahn]. But [he thought that Boigenzahn] really had been a pretty good jailer on a lot of other notes, . . . so the decision was made to give him a three-day suspension and try and say wake up." Accordingly, on August 26, 2015, Dunn County suspended Boigenzahn for three days without pay. When communicating the Sheriff's disciplinary decision, the Chief Deputy warned Boigenzahn:

> I expect you will take this opportunity to correct your improper conduct in the future, fully meet the duties and responsibilities required of you and observe all the rules and procedures of your job. If you fail to do so, you will subject yourself to further disciplinary action, including discharge and termination of your employment with the County.

Boigenzahn returned to work on August 29, 2015. The Sheriff also considered moving Boigenzahn to the day shift so he could be under greater supervision because more staff worked that shift, but the Sheriff decided against this because "it would affect somebody on day shift that would be bumped off from that shift and forced onto the night shift."

¶12 About nine months later, in May 2016, inmate A.D. reported to Sergeant Vold that Boigenzahn again acted inappropriately. She stated that Boigenzahn frequently contacted inmate B.S. A.D. stated that on one occasion Boigenzahn accepted a note that was sexual in nature from B.S. Surveillance footage showed that on April 17, 2016, at 2:32 a.m., Boigenzahn spent 12 minutes out of camera view and near

10

B.S.'s bunk. Boigenzahn later admitted that he did receive the note from B.S. On May 19, 2016, the County placed Boigenzahn on administrative leave, and on May 31, 2016, he was terminated.

¶13 About one month after Dunn County terminated Boigenzahn, on June 27, 2016, inmate Slabey was heard saying, "[Boigenzahn] must have stuck his hand down somebody else's pants, too." According to Slabey, she said this "jokingly." Investigator Dan Westlund, however, who was at the jail to interview Slabey regarding an unrelated matter, overheard Slabey's remark. He immediately reported what he heard to the Jail Captain. Pursuant to County policy, the Jail Captain called her supervisor, the Chief Deputy, and the matter was reported to the Sheriff. The Sheriff requested that an outside agency investigate Slabey's allegations. The Menomonie Police Department then investigated the allegations against Boigenzahn.

¶14 The criminal investigation regarding Slabey's statement revealed that on March 25, 2016, about seven months after Boigenzahn was first disciplined by the County, he sexually assaulted Slabey. Boigenzahn entered the Huber Dorm[4] and talked with Slabey and her bunkmate. Slabey was on the top

---

[4] The Huber Dorm is an open area with bunk beds for inmates on Huber work release. See generally Wis. Stat. § 303.08 (2019-20).

11

bunk in a location that was apparently out of camera view.[5] According to Slabey, she "made a comment [to Boigenzahn] about do you ever get in trouble . . . . And he's like yeah, I've gotten in trouble before, he's like, but I can -- pretty much saying he didn't care, you know." It is undisputed that during this time, Boigenzahn began touching Slabey and put his hand down her pants. Slabey told Boigenzahn, "no," and he pulled his hand out. According to Slabey, Boigenzahn said, "you're not going to tell on me, are you. . . . And [Slabey] told him no, I'm not going to tell on you." Radio checks were typically conducted after ten minutes of not hearing from a CO on rounds and, according to Boigenzahn, he did receive a radio check the night of the assault. There was however no radio check during the 45 minutes Boigenzahn was with Slabey and her bunkmate. Boigenzahn was charged and subsequently convicted and sentenced to prison for second-degree sexual assault by correctional staff contrary to Wis. Stat. § 940.225(2)(h) (2016-17).

¶15 Notably, it was just two days prior to the sexual assault that, pursuant to Dunn County policy, Boigenzahn had attended a legal update session that included PREA training. Boigenzahn admitted that, at the time of the sexual assault, he

---

[5] According to Slabey's deposition, also on or about March 25, 2016, Slabey asked Boigenzahn "if [she] could move down to the bottom bunk . . . because it was open." Slabey claimed Boigenzahn "told [her], why would you want to move there because this one is off camera view up here, and he said that [she] couldn't move." Slabey took this to mean at the time that it would be easier for her to have contraband if she remained on the top bunk.

12

knew it was against state law, against County policy, and against PREA.

¶16 On November 15, 2017, Slabey commenced this action against Dunn County under 42 U.S.C. § 1983, alleging that the County violated her rights under the Eighth and Fourteenth Amendments to the United States Constitution.[6] Dunn County moved for summary judgment, arguing that it was not liable under § 1983 because "the County did not act with deliberate indifference to [Slabey's] safety," "there is no evidence upon which a jury could find a Dunn County policy, custom, or practice violated her constitutional rights," and "[Slabey's] substantive due process rights were not violated by the County." Slabey opposed summary judgment, arguing that there are "sufficient facts to support a jury finding [of] deliberate indifference" and that "Dunn County's informal custom/policy of ignoring dangers to female inmates caused Slabey's [sexual] assault."

¶17 The circuit court held a hearing on Dunn County's motion and subsequently issued a written decision granting Dunn County summary judgment. The court concluded, "There is no evidence that [Dunn County's] training practices were

---

[6] In her petition for review, Slabey asserted claims against not just Dunn County but also several individual defendants employed by the County. In her briefing, however, Slabey asserts claims only against Dunn County and therefore has abandoned her claims against the individual defendants. A.O. Smith Corp. v. Allstate Ins. Companies, 222 Wis. 2d 475, 492, 588 N.W.2d 285 (Ct. App. 1998) ("[A]n issue raised on appeal, but not briefed or argued, is deemed abandoned.").

constitutionally deficient and that the County was aware of the deficiency and failed to abate the deficiency."

¶18 Slabey appealed the circuit court's order. The court of appeals affirmed, concluding there is "no evidence upon which a reasonable fact finder could rely to conclude [Dunn County was] deliberately indifferent to a substantial risk that Boigenzahn would sexually assault an inmate." Slabey, No. 2020AP877, ¶1.

¶19 Slabey petitioned this court for review, which we granted.

## II. STANDARD OF REVIEW

¶20 "We independently review a grant or denial of summary judgment, applying the same method as the circuit court." Hoida, Inc. v. M&I Midstate Bank, 2006 WI 69, ¶15, 291 Wis. 2d 283, 717 N.W.2d 17. "While our review is independent from the circuit court and court of appeals, we benefit from their analyses," both of which concluded that summary judgment is appropriate. DSG Evergreen Fam. Ltd. P'ship v. Town of Perry, 2020 WI 23, ¶15, 390 Wis. 2d 533, 939 N.W.2d 564. "We will affirm a grant of summary judgment when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Baumeister v. Automated Prods., Inc., 2004 WI 148, ¶11, 277 Wis. 2d 21, 690 N.W.2d 1. "A factual issue is 'genuine' if the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party." Midwest Neurosciences Assocs., LLC v. Great

14

Lakes Neurosurgical Assocs., LLC, 2018 WI 112, ¶80, 384 Wis. 2d 669, 920 N.W.2d 767.

## III. ANALYSIS

¶21 The parties do not dispute that Slabey suffered a constitutional deprivation because she was sexually assaulted by Boigenzahn.[7]  The issue in this case is not whether Boigenzahn committed a sexual assault.  He did, and what he did to Slabey was terribly wrong.  But a claim against Boigenzahn is not the claim we analyze today.  Whether Dunn County is liable to Slabey under 42 U.S.C. § 1983 is an altogether separate legal inquiry.  In analyzing that issue, we must consider the exacting standards set forth in Monell, 436 U.S. 658.  In short, Slabey asserts that "Dunn County was deliberately indifferent to a substantial risk of harm to Slabey by failing to thoroughly investigate, appropriately discipline, and adequately supervise Boigenzahn."[8]

¶22 Because the only issue before us is whether Dunn County is liable to Slabey under § 1983, we must analyze the standards outlined in Monell.  We begin with an overview of

---

[7] Though the issue is not before us, for purposes of this review, we assume without deciding that Boigenzahn violated Slabey's constitutional rights.

[8] Slabey raised an additional issue in her opening brief, arguing that Dunn County is not entitled to qualified immunity. However, Dunn County does not argue here that it is entitled to qualified immunity.  Nor could it.  It is well settled that municipalities cannot assert qualified immunity.  Owen v. City of Independence, 445 U.S. 622 (1980) (holding that municipalities are not entitled to qualified immunity); see also Davis v. United States, 564 U.S. 229, 248 n.9 (2011) (recognizing the same).

15

municipal liability under § 1983. See Monell, 436 U.S. 658. Specifically, the causation requirement in Monell is dispositive. We then conclude that Slabey failed to demonstrate that Dunn County's action or inaction was the moving force behind her constitutional deprivation. Because Slabey cannot demonstrate the requisite causation, we need not analyze the other criteria of a municipality's liability in a § 1983 claim under Monell.

### A. Monell Liability Generally

¶23 Unlike any liability that may exist for an individual like Boigenzahn, in order for a municipality to be liable in a 42 U.S.C. § 1983 action, the plaintiff must demonstrate that she can satisfy the exacting standards set forth by Monell. Under § 1983,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .

In Monell, 436 U.S. 658, the United States Supreme Court interpreted "person" within the meaning of § 1983 as including local governing bodies. Monell involved public employees whose employers "had as a matter of official policy compelled pregnant employees to take unpaid leaves of absence before such leaves were required for medical reasons." Id. at 660-61. The employees sued the Department of Social Services and Board of

16

Education of the City of New York for damages under § 1983. Id. at 660-62. The Court held that the employees could sue these local governing units:

> Congress did intend municipalities and other local government units to be included among those persons to whom § 1983 applies. Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.

Id. at 690 (footnotes and emphasis omitted).

¶24 However, the Court also explained that "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." Id. at 691. "[A] municipality cannot be held liable solely because it employs a tortfeasor——or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." Id. (emphasis omitted). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Id. at 694. Monell and its progeny thus require a plaintiff to satisfy each of the following to prove municipal liability under § 1983: (1) "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury"; (2) "the municipal action was taken with the requisite degree of culpability"; and (3) there

17

is "a direct causal link between the municipal action and the deprivation of federal rights." Bryan Cnty., 520 U.S. at 403-04. Because this case is resolved on the third requirement, causation, we need not address the first two.

### B. Section 1983 Causation Under Monell.

¶25 To prevail in her claim under 42 U.S.C. § 1983 against Dunn County, Slabey must demonstrate that the County caused her constitutional deprivation. Slabey argues that causation is satisfied because (1) "Dunn County failed to thoroughly investigate claims that Boigenzahn's conduct would cross a line"; (2) "Dunn County failed to appropriately discipline Boigenzahn in light of the clear risk of harm that his conduct posed to inmates generally and Rachel Slabey specifically"; and (3) Dunn County "failed to properly supervise Boigenzahn to prevent any further escalation of his misconduct." Slabey argues that these acts of the County caused her constitutional deprivation because they "caused Boigenzahn's conduct to escalate to Slabey's assault."

¶26 "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of . . . causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." Bryan Cnty., 520 U.S. at 405. Monell requires plaintiffs to "demonstrate a direct causal link between the municipal action and the deprivation of federal rights." Id. at 397. "[M]ere 'but-for' causation is insufficient." Harte v. Bd. of Comm'rs, 864 F.3d 1154, 1204

18

(10th Cir. 2017) (quoting Bryan Cnty., 520 U.S. at 410). Rather, a plaintiff bringing a § 1983 claim under Monell must demonstrate that a municipality was not just a cause, but the "moving force" behind the constitutional deprivation. Monell, 436 U.S. at 694-95.

¶27 Monell's causation requirement is a high bar for plaintiffs to clear. "[L]esser standards . . . would require the federal [and state] courts endlessly to 'second-guess' the wisdom of municipal [programs], a task inappropriate for the federal [and state] judiciar[ies]." Doe v. Taylor Indep. Sch. Dist., 15 F.3d 443, 453 (5th Cir. 1994) (citing City of Canton, 489 U.S. at 392). The requirement is "applied with especial rigor when the municipal policy or practice is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate training, supervision, and deficiencies in hiring." Schneider v. City of Grand Junction Police Department, 717 F.3d 760, 770 (10th Cir. 2013) (quoting Martin A. Schwartz, Section 1983 Litigation Claims & Defenses § 7.12 (2013)). In such cases, a § 1983 plaintiff "must" prove causation by showing "that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." Bryan Cnty., 520 U.S. at 407 (citation omitted). Evidence of a "pattern of tortious conduct" is typically necessary to establish that the municipal action "rather than a one-time negligent administration of the program or factors peculiar to the officer involved in a particular

19

incident, is the 'moving force' behind the plaintiff's injury." Id. at 407-08 (citing City of Canton, 489 U.S. at 390-91); see also Oklahoma City v. Tuttle, 471 U.S. 808, 824 (1985) ("[W]here the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish . . . the causal connection between the 'policy' and the constitutional deprivation.").

¶28 Slabey acknowledges that hers is a "single incident" case because of the "absence of prior sexual assaults of female inmates by male guards." She argues that, although the single-incident theory governs her claim, she nonetheless prevails under that theory because "Dunn County acted with deliberate indifference to a significant, obvious risk of sexual violence to all female inmates."

¶29 Though not impossible, it is exceedingly rare that a § 1983 plaintiff under Monell can prove causation based on a single incident.[9] The United States Supreme Court first

---

[9] This rigorous standard is what drives our analysis. Section 1983 plaintiffs suing municipalities must clear a high bar——a bar that is even higher when alleging liability based on a "single incident." For those who would relax this standard by conflating it with our standard of review on summary judgment, doing so would massively broaden the "single incident" exception and "only invite jury nullification of Monell." City of Canton v. Harris, 489 U.S. 378, 399 (1989) (O'Connor, J., concurring).

20

recognized the possibility of such a claim in <u>City of Canton v. Harris</u>, 489 U.S. 378. In <u>City of Canton</u>, officers failed to seek medical attention for an arrested suspect despite the suspect sitting on the floor of the patrol car, responding with "an incoherent remark" when asked if she needed medical attention, "slump[ing] to the floor on two occasions," and lying on the floor. <u>Id.</u> at 381. The plaintiff argued that the officers "were not provided with any special training (beyond first-aid training) to make a determination as to when to summon medical care for an injured detainee." <u>Id.</u> at 382. The Supreme Court noted that a claim based on a single incident might survive in some cases:

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

---

If this were not the well-established standard, we could instead reinvent § 1983 law and analyze how Dunn County might have merely allowed, rather than caused, Slabey's constitutional deprivation. However, that would be a sea change in the law. Causation under <u>Monell</u> requires much more than "but-for" causation. <u>Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown</u>, 520 U.S. 397, 404, 410 (1997) (citing <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658 (1978)). "In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." <u>City of Canton</u>, 489 U.S. at 392. Whether Dunn County could have done more is not the applicable legal standard.

21

Id. at 390. In such a situation, "the need to train . . . can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." Id. at 390 n.10 (citation omitted). The Supreme Court dismissed the § 1983 claim and concluded that "the evidence in the record . . . does not meet th[is] standard of § 1983 liability." Id. at 392.

¶30 The Supreme Court again considered, but rejected, an argument that this "single-incident" theory applied in Board of Commissioners of Bryan County v. Brown, 520 U.S. 397. There, the § 1983 plaintiff argued that the municipality was liable for an officer's use of excessive force because it failed to adequately screen the officer's background prior to hiring him, and that such screening would have uncovered that the officer was previously "charged with assault and battery, resisting arrest, and public drunkenness." Id. at 412-13. The Court reasoned, "[e]ven assuming without deciding that proof of a single instance of inadequate screening could ever trigger municipal liability, the evidence in this case was insufficient to support a finding that, in hiring [the officer], [the Sheriff] disregarded a known or obvious risk of injury." Id. at 412.

¶31 The Supreme Court also considered and rejected the single-incident theory posed in Connick v. Thompson, 563 U.S. 51 (2011). In Connick a § 1983 plaintiff sued a municipality for a constitutional deprivation caused by a prosecutor's failure to turn over exculpatory evidence. Id. at 55-56. The Court

22

reasoned that because prosecutors already received legal training on the issue, the § 1983 plaintiff's constitutional deprivation was not "so predictable that failing to train the prosecutors amounted to conscious disregard for defendants[]." Id. at 71 (emphasis omitted). The Court therefore concluded that this case did not fall within the "narrow range of 'single-incident' liability hypothesized in Canton as a possible exception to the pattern of violations necessary to prove deliberate indifference in § 1983 actions."[10] Id. at 71-72.

¶32 The Tenth Circuit in Schneider v. City of Grand Junction Police Department, 717 F.3d 760, similarly rejected use of the single-incident theory in a § 1983 claim. There, an officer sexually assaulted a 911 caller while responding to the call. Id. at 763. The plaintiff argued that, in light of a prior complaint against the officer, the municipality failed to adequately investigate, discipline, and supervise the officer. Id. at 766. The court rejected each of these claims against the municipality. The court relied on the facts that the municipality "conducted the criminal investigation regarding the [prior] complaint," and it "disciplined [the officer] with a pay cut and probation" along with a "notice of discipline [informing

---

[10] In each of these cases where the Supreme Court hypothesized that single-incident theory could apply, the plaintiffs brought failure-to-train claims, and the Court considered the possibility that the theory might apply only in such cases. We note that Slabey's claim is based on alleged failures to investigate, discipline, and supervise Boigenzahn, but not a failure to train him.

23

the officer] that his conduct was unacceptable." Id. at 775, 777. As for the failure-to-supervise claim, the court found "no evidence that additional controls or sanctions . . . would have had any more deterrent effect than the already-present threats of discharge and criminal punishment." Id. at 780.

¶33 Similarly, the First Circuit in Santiago v. Fenton, 891 F.2d 373, 382 (1st Cir. 1989), rejected a § 1983 claim that was based on a single incident. The officer in Santiago used excessive force against the plaintiff, who argued the municipality failed to discipline the officer for an earlier incident. Id. The court nonetheless concluded that the municipality was entitled to summary judgment on the failure-to-discipline claim and stated:

> The city and the department undisputedly had a policy of investigating complaints that expressly included the disciplining of officers in appropriate circumstances. In both of these instances the department conducted an investigation and hearing but decided that discipline was not appropriate. As we have indicated before, we cannot hold that the failure of a police department to discipline in a specific instance is an adequate basis for municipal liability under Monell.

Id.

¶34 Slabey places great reliance on the Seventh Circuit's decision in J.K.J. v. Polk County, 960 F.3d 367 (7th Cir. 2020) (en banc), where a § 1983 plaintiff succeeded on the single-incident theory.[11] In J.K.J., the Seventh Circuit concluded that

---

[11] Four judges on the en banc panel dissented: Circuit Judges Easterbrook, Brennan, Bauer, and Sykes.

24

Polk County, Wisconsin, acted with deliberate indifference "in the face of an obvious and known risk that its male guards would sexually assault female inmates." Id. at 381 (emphasis omitted). That case involved two inmates at the Polk County Jail who "endured repeated sexual assaults at the hands of [a] correctional officer." Id. at 370.

¶35 When Polk County had earlier learned of similar allegations against a different guard, it "imposed minor discipline on the guard but from there took no institutional response——no review of its policy, no training for guards, no communication with inmates on how to report such abuse, no nothing." Id. at 370-71. The jail's Captain "knew of sexual comments male guards made about female inmates" and "admitted to himself participating in [it]." Id. at 382. The Captain also knew that an officer's conduct "began with watching [the inmate] shower, grew to requests to expose her body for him, and in time intensified to forcibly touching her in a sexual manner——all the while ordering her to 'keep quiet.'" Id. Importantly, "with red lights flashing, Polk County chose the one unavailable option——doing nothing. It did not change its sexual abuse policy, institute a training, inquire of female inmates, or even call a staff meeting." Id. at 383. Although Polk County did investigate and reprimand a guard for inappropriate sexual behavior, jail officials assured him that it was "not a big deal." Id.

¶36 Unlike Polk County, this record reflects that Dunn County in fact required significant, relevant training of its

25

officers and took nearly immediate action upon a complaint of noncompliant conduct. Dunn County thoroughly investigated the August 2015 complaint and acted in a timely manner to impose unpaid leave on the officer. Boigenzahn was sternly warned for the policy violations, which were passing notes between inmates and non-sexual physical contact with an inmate. He was warned that his behavior would not be tolerated and that he could be terminated. Leave without pay was one of the most severe options of discipline, just short of termination. When Boigenzahn returned to duty, he was required to continue training and monthly policy reviews.

¶37 Nine months had gone by with Boigenzahn working as a CO, and there was no indication of his noncompliance. The very next time the County learned that Boigenzahn was noncompliant because he had received a note from an inmate, he was terminated. In fact, unlike the facts in Polk County, Dunn County first gained knowledge of this off-camera sexual assault only after the County had already terminated Boigenzahn.

¶38 Slabey argues Dunn County acted with deliberate indifference to a known or obvious consequence that Boigenzahn would sexually assault an inmate when it "failed to thoroughly investigate claims that Boigenzahn's conduct would cross a line," "failed to appropriately discipline Boigenzahn in light of the clear risk of harm that his conduct posed to inmates generally and Rachel Slabey specifically," and when it "failed to properly supervise Boigenzahn to prevent any further escalation of his misconduct." However, this allegation in the

26

August 2015 complaint was thoroughly investigated. The County officials reviewed two weeks of surveillance video, interviewed inmates, and concluded that Boigenzahn committed a serious violation of County policy. The evidence demonstrated that Boigenzahn passed notes between inmates and had inmate non-sexual contact. The County acted within a month from allegation to discipline. The matter did not languish. Despite several less severe options, Boigenzahn was suspended for three days without pay and sternly warned, "If you fail to [correct your improper conduct], you will subject yourself to further disciplinary action, including discharge and termination of your employment with the County." He was also given additional PREA training two days before the assault. For about nine months after Boigenzahn returned, Dunn County had no reason to believe he was noncompliant.

¶39 Nonetheless, Slabey argues that the County should have done more and, because it did not, it caused her constitutional deprivation. In other words, she argues that the County's deliberate indifference "caused Boigenzahn's conduct to escalate to Slabey's assault." However, Slabey offers insufficient evidence of how the County was deliberately indifferent given its policies, training, investigation, discipline, and additional stern warning of termination for conduct quite unlike a sexual assault. According to Slabey, the only way to safeguard against the wrong that was done to her would be that the County should have terminated Boigenzahn, constantly supervised him, or not allowed him to have any contact with

27

female inmates.[12]   However, the record reflects that three COs worked the night shift, with two splitting up to do rounds in different parts of the Jail and the third staying in the central office.[13]   Additionally, staffing restrictions prevented the County from moving Boigenzahn off the night shift.   In other words, constant supervision or moving Boigenzahn were unworkable options given Dunn County's Jail; therefore, the only acceptable option in hindsight would have been to terminate Boigenzahn for passing notes and nonsexual conduct.   Accepting Slabey's arguments would make the County liable on a respondeat superior theory, a result the Supreme Court has explicitly rejected. Monell, 436 U.S. at 691.

¶40  In short, Dunn County is entitled to summary judgment because there is insufficient evidence for a reasonable fact finder to conclude that Dunn County was the moving force behind her being sexually assaulted.   Boigenzahn sexually assaulting Slabey was the result of his action, which was completely forbidden by Dunn County and the criminal law.   It is hindsight

---

[12] Slabey also identifies the County's failure to conduct a radio check during the 45 minutes that Boigenzahn was with Slabey, and its failure to make sure Slabey's bunk was in view of a surveillance camera as acts of deliberate indifference. However, these demonstrate the kind of "one-time negligent administration of [a] program" that is insufficient to satisfy Monell causation.  Bryan Cnty., 520 U.S. at 408.

[13] The Jail Captain testified in her deposition that typically three COs worked the night shift, and that one of them stayed in the central office at all times.  Boigenzahn testified in his deposition that two COs "split up" to do facility-wide checks.

alone that underlies Slabey's causation theory. Causation in the context of a § 1983 claim requires much more. "[L]esser standards . . . would require the federal [and state] courts endlessly to 'second-guess' the wisdom of municipal [programs], a task inappropriate for the federal [and state] judiciar[ies]." Doe, 15 F.3d at 453 (citing City of Canton, 489 U.S. at 392). Taken together, these facts do not demonstrate that the known or obvious consequence of the County's action or inaction was that Boigenzahn would sexually assault an inmate.

¶41 Overall, Slabey's allegations do not rise to the level of a cognizable § 1983 claim against Dunn County. Just because the County could have, in hindsight, done some things differently, does not mean that the County was the moving force behind the assault. Section 1983 "does not provide plaintiffs or courts carte blanche to micromanage local governments throughout the United States." Connick, 563 U.S. at 68. The standards of a § 1983 claim under Monell are exacting. Slabey's claim does not survive that scrutiny.

## IV. CONCLUSION

¶42 Slabey argues that her 42 U.S.C. § 1983 claim against Dunn County survives summary judgment because she presented evidence sufficient for a reasonable jury to find that Dunn County violated her rights under the Eighth and Fourteenth Amendments to the United States Constitution when Boigenzahn sexually assaulted her. According to Slabey, Dunn County is liable because the "County was deliberately indifferent to a substantial risk of harm to Slabey by failing to thoroughly

29

investigate, appropriately discipline, and adequately supervise Boigenzahn." Slabey argues that the circuit court erroneously granted Dunn County summary judgment, and that the court of appeals erred in affirming that result.

¶43 We conclude that Slabey's § 1983 claim against Dunn County fails because, under Monell, no reasonable fact finder could conclude that Dunn County was the causal, moving force behind the sexual assault. A § 1983 plaintiff suing a municipality for a constitutional deprivation must prove that the municipality caused——that is, was the moving force behind—— the constitutional deprivation. This requires evidence "that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." Bryan Cnty., 520 U.S. at 407 (quoting City of Canton, 489 U.S. at 388). Here, there is insufficient evidence that Dunn County acted with deliberate indifference to a known or obvious consequence that Boigenzahn would sexually assault Slabey. The circuit court was correct to grant Dunn County summary judgment on Slabey's § 1983 constitutional deprivation claim. We affirm the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶44  JILL J. KAROFSKY, J.  *(dissenting)*.  "The confinement setting is a tinderbox for sexual abuse." J.K.J. v. Polk Cnty., 960 F.3d 367, 381 (7th Cir. 2020).

¶45  While women are vulnerable almost everywhere in our society, they are especially at risk in correctional settings where an estimated 25 to 41 percent of incarcerated women are sexually abused. Hannah Brenner et al., Bars to Justice: The Impact of Rape Myths on Women in Prison, 17 Geo. J. Gender & L. 521, 537-38 (2016).  In such settings female prisoners are dependent on guards (who are disproportionately male) for their very existence.  This includes "their safety as well as their access to food, medical care, recreation and even contact with family members." J.K.J., 960 F.3d at 381.  Due to the imbalances of power, the correctional context is ripe for abuse as "[p]rison rape represents the intersection of masculine elitism and deprivations of civil rights." Maureen Brocco, Facing the Facts: The Guarantee Against Cruel and Unusual Punishment in Light of PLRA, Iqbal, and PREA, 16 J. Gender Race & Just. 917, 917 (2013).  Sexual abuse is about power and control and "this psychosocial dynamic is amplified in the prison context." Id.

¶46 Victims of sexual abuse often confront profound physical, social, and psychological effects.  These effects can be debilitating and overwhelming, and they are magnified in confinement settings.  "Victims often endure great physical pain and sustain various injuries.  Moreover, any episode of sexual assault could ultimately prove deadly since incarcerated victims

1

are at an increased risk of contracting sexually transmitted and other communicable diseases such as HIV, AIDS, tuberculosis, and hepatitis B and C."  Kevin R. Corlew, Congress Attempts to Shine a Light on a Dark Problem: An In-Depth Look at the Prison Rape Elimination Act of 2003, 33 Am. J. Crim. L. 157, 160 (2006).

¶47 To combat the scourge of sexual assaults in the confinement setting, Congress passed the Prison Rape Elimination Act (PREA) in 2003.  But the enactment of a law aimed at stopping prison rapes does not in and of itself put an end to sexual violence.  Prisons and jails must take steps to prevent and detect sexual misconduct.  And important to this case, when sexual abuse does occur, it is incumbent on the judicial system to hold to account those who are responsible in order to protect vulnerable inmates.  It is here where the majority falls short. In wrongly concluding that the circuit court's grant of summary judgment for Dunn County should be upheld, the majority allows the county to escape all responsibility for (1) ignoring clear warning signs that former Dunn County correctional officer Ryan Boigenzahn had engaged in inappropriate and escalating behavior with female inmates, and (2) creating the circumstances that allowed Boigenzahn to sexually assault Rachel Slabey while she was incarcerated in the Dunn County Jail.

## I. BACKGROUND

¶48 Boigenzahn sexually assaulted Slabey[1] while she was in her bunk in the Dunn County Jail on March 25, 2016.[2] It was the middle of the night in the Huber Dorm.[3] Boigenzahn was tasked with checking the women's dorm despite his recent suspension for violating the jail's fraternization policy. Boigenzahn surveyed the women's dorm alone, unmonitored, and entirely unsupervised. That night, Boigenzahn spent 45 minutes in Slabey's dorm, an extraordinarily long time compared to the few seconds that guards usually took to check the dorm during the night. And although the Dunn County Jail practice is for the central office of the jail to conduct radio checks when an officer fails to report back to the central office after 10 minutes, no supervisor checked in on Boigenzahn during the 45 minutes he was in the dorm, despite his known history of fraternization. By

---

[1] Normally, to protect the dignity and privacy of Slabey, a victim of sexual assault, I would use initials or pseudonyms to identify her. However, because Slabey filed this lawsuit using her real name, I do not follow that practice for her here. To protect the dignity and privacy of other inmates, who were witnesses or victims of Boigenzahn, I use initials.

[2] Mindful that this is a summary judgment review, I will set out the factual background necessary to understanding this case by presenting Slabey's evidence as true while drawing all reasonable inferences in her favor, as the court must when reviewing a summary judgment decision. See Burbank Grease Servs., LLC v. Sokolowski, 2006 WI 103, ¶40, 294 Wis. 2d 274, 717 N.W.2d 781.

[3] A Huber facility is a county correctional facility that houses inmates who have been granted leave privileges (typically work release) under Wis. Stat. § 303.08(1). See Wis. Stat. § 303.09.

all accounts, no one was monitoring Boigenzahn as he abandoned his duties to prowl around Slabey's dorm.

¶49 The jail assigned Slabey to the only bunk in the dorm that was entirely unmonitored by security cameras, a fact both Boigenzahn and Slabey knew. Boigenzahn himself previously denied Slabey's request to be moved to a different bunk. Additionally, the jail recently transferred Slabey from administrative segregation, causing her concern that if she did anything to "make a scene" or displease Boigenzahn, she would be transferred back. And, unsurprisingly, Slabey did not think that anyone would believe her or protect her if she spoke up and complained about Boigenzahn. In a word, Slabey was vulnerable.

¶50 Armed with the knowledge of his victim's vulnerabilities, Boigenzahn entered the Huber Dorm, found Slabey and her bunkmate, D.S., and began talking with them. One of the topics of conversation was Boigenzahn's reputation for spending an inappropriate amount of time with female inmates. Slabey "made a comment [to Boigenzahn] about do you ever get in trouble . . . . And [Boigenzahn was] like yeah, I've gotten in trouble before, he's like, but I can——pretty much saying he didn't care, you know." As he was talking to the inmates, Boigenzahn began touching Slabey, first by rubbing her hand. Slabey tried to protect herself by moving away and lying down, but Boigenzahn persisted. He went after her, grabbing her pants, then her leg, then Boigenzahn shoved his hand down Slabey's pants and inside her underwear.

4

¶51 While Boigenzahn was sexually assaulting her, Slabey, now completely defenseless, went silent. She did not want to call attention to his actions "because it was so quiet in there" and she "didn't want to have a scene or have him say something like, oh, [she] did something and put [her] back in [segregation]." During the sexual assault, Slabey felt "confused," "in shock" and "didn't know what to do." After sexually assaulting her, Boigenzahn asked Slabey if she would tell anyone. Slabey told him no, and soon after, Boigenzahn left the Huber Dorm.

¶52 This sexual assault did not occur without warning. It was not a freak occurrence, a force majeure that could have neither been foreseen nor prevented. Instead, sheriff's department officials——importantly here, the Sheriff himself—— first ignored the clear warning signs that Boigenzahn had already engaged in inappropriate and escalating behavior with female inmates, and then created the circumstances that allowed Boigenzahn to sexually assault Slabey.

¶53 Prior to the sexual assault, the Sheriff had ample warning that Boigenzahn was, in the words of one inmate, "dangerously close to crossing the line." Sheriff's department officials were first alerted to Boigenzahn's conduct in July 2015, about eight months before the sexual assault. Inmate J.W.B. informed a correctional officer, and subsequently a jail sergeant, that officials needed to "keep a close eye on" the

5

male correctional staff.[4]  When asked for an example, J.W.B. explained that on two separate occasions, an officer passed notes between female and male inmates.  J.W.B. originally refused to identify the officer in question for fear of retaliation, but upon further questioning, she identified Boigenzahn.  Passing notes was a violation of the Dunn County Jail's fraternization policy, one that historically resulted in suspension or termination.  Despite the seriousness of the allegations, the sergeant only reviewed surveillance video for one of the two instances J.W.B. reported, and he failed to question Boigenzahn or the inmates directly.  After this cursory investigation, the sergeant concluded that there was no factual basis for J.W.B's claims.

¶54 About one week later, another inmate, B.M., told a different sergeant that Boigenzahn was dangerously close to "crossing the line," and that he had been getting "too chummy" with some of the female inmates.  B.M. said that she had not yet witnessed anything sexual, but she believed "that was a possibility if things progressed."  As an example, she told this

---

[4] When questioned whether her concerns were "in regards to fraternization," J.W.B. indicated that she did not understand what fraternization meant.  The sergeant then asked whether the officer "was developing a relationship with an inmate."  J.W.B. answered in the negative, but there was no additional explanation of what the sergeant meant by "relationship" in that context nor any additional attempt to understand what J.W.B. understood "relationship" to mean.  This exchange illustrates how important it is to ensure that female inmates (as well as guards) understand "what abuse entails," particularly since "they may come from life experiences that have blurred the lines of abnormal and normal relationships."  J.K.J. v. Polk Cnty., 960 F.3d 367, 375 (7th Cir. 2020).

sergeant that Boigenzahn had been talking with another inmate, A.D., when A.D. playfully slapped Boigenzahn on the chest. B.M. said that if there was an opportunity when there were no cameras around, "something might happen," and "all the females in the Jail talk about that." If Boigenzahn hadn't already crossed the "bright line" that staff are not supposed to cross, B.M. said, "he [was] getting dangerously close to doing it."

¶55 In response to the above reports, sheriff's department officials reviewed surveillance footage and found two incidents that corroborated B.M.'s concerns. First, on July 29, Boigenzahn entered the Huber Dorm, stepped out of camera range for a few minutes, then stepped back into view when another officer entered the room. While the other officer was handing out breakfast, Boigenzahn reached out and "playfully" stepped on A.D.'s foot. She then stepped back on his foot. Second, on August 6, Boigenzahn entered the dorm and shut the door behind him. He gestured "as if motioning someone to come in his direction," at which point A.D. ran over to him and "brush[ed] him with her hand on his shoulder/chest area."

¶56 Sheriff's department officials then questioned A.D., asking her whether any officer ever made her feel uncomfortable. A.D. "immediately" informed the officials that Boigenzahn made her feel uncomfortable and provided the following three examples. First, she described an instance where her hand and Boigenzahn's hands accidentally touched. She pulled her hand away and apologized, but he responded that "it was alright, he didn't mind." Second, other inmates told her that Boigenzahn

7

seemed to be "obsessed" with her, and they observed him standing and watching her sleep. Third, she explained that he just "lingered too long" around her. Like J.W.B., A.D. explained that she did not report Boigenzahn sooner because she was afraid of retaliation. In response to A.D.'s statements, the sergeant pressed A.D. and asked "if there had ever been anything more than statements made or him watching her." In doing so, the sergeant seemingly dismissed A.D.'s claim that Boigenzahn was obsessed with her, watched her sleep, and lingered too long around her, as if that information alone were unimportant to the investigation.

¶57 Sheriff's department officials then met with Boigenzahn and questioned him about the inmates' allegations. Boigenzahn initially lied to the officials and denied passing notes between inmates, only confessing after he learned that he would be terminated if he were not truthful. He denied that he acted inappropriately toward A.D., which officials also found to be false.

¶58 Despite knowing that Boigenzahn had, at the very least, violated the jail's fraternization policy and attempted to conceal and lie about his violations, the Sheriff decided against terminating Boigenzahn. The Sheriff made this choice despite the fact that violations of the fraternization policy "historically" resulted in termination, and despite the fact that Boigenzahn's lying, in and of itself, was grounds for termination. The Sheriff opted instead for a far more lenient response and suspended Boigenzahn for three days before allowing

him to return to work——in the same position——where he continued to have unfettered access to vulnerable women inmates. The Sheriff did not put Boigenzahn on a different shift, one where more staffing would allow for more supervision. He did not assign Boigenzahn to a different section, away from female inmates. He did not bar Boigenzahn from having further unsupervised contact with female inmates; in fact, he did not assign any staff to further monitor or investigate Boigenzahn at all. Instead, the Sheriff sent an officer who violated jail policies, lied to officials, and raised such serious red flags that multiple inmates reported him despite fears of retaliation, back to guard female inmates on the lightest-staffed shift with little to no monitoring. And that is how former officer Boigenzahn accessed, cornered, and sexually assaulted, Slabey on March 25, 2016.

## II. ANALYSIS

¶59 When Dunn County took Slabey into custody, it assumed an affirmative duty to protect her from harm. DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 199-200 (1989) ("When the State takes a person into its custody and holds [her] there against [her] will, the Constitution imposes upon it a corresponding duty to assume some responsibility for [her] safety and general well-being."). Sexual assault is one of those harms, for while the Eighth Amendment "does not mandate comfortable prisons," sexual assault "is simply not part of the penalty that criminal offenders pay for their offenses against society." See Farmer v. Brennan, 511 U.S. 825, 832-834 (1994)

9

(internal citations omitted). Sexual offenses "tend . . . to cause significant distress and often lasting psychological harm," Washington v. Hively, 695 F.3d 641, 643 (7th Cir. 2012), and there is little doubt that Slabey's Eighth Amendment rights were violated when Boigenzahn sexually assaulted her. The only question here is whether Slabey may hold Dunn County accountable under 42 U.S.C. § 1983, which "plainly imposes liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights." See Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 692 (1978).

¶60 While the standards for establishing municipal liability under § 1983 are rigorous, "they are not insurmountable." J.K.J., 930 F.3d at 378. In order to establish liability and survive summary judgment on her claim against Dunn County, Slabey must bring sufficient evidence for a jury to reasonably find that Dunn County (1) had an official policy, custom, or decision, (2) that demonstrated the requisite level of culpability, and (3) caused her injury. See Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown, 520 U.S. 397, 403-404 (1997). I will discuss each of these elements in turn before explaining why a jury could reasonably find for Slabey on each.

¶61 First, Slabey must identify an official Dunn County policy or custom that caused her injury. Monell, 436 U.S. at 690. The Supreme Court has recognized that a decision by an official with final policy-making authority meets this

10

requirement——that is, municipal liability attaches when "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986). Inaction, as well as action, may serve as the basis for municipal liability, depending on the circumstances. Connick v. Thompson, 563 U.S. 51, 61-62 (2011) ("[a] policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution." (internal citations omitted)).

¶62 Second, Slabey must establish Dunn County's culpability, which under Monell means that she must provide sufficient evidence for a jury to find that the county's actions demonstrated a "deliberate indifference" to the "known or obvious" consequence that a constitutional violation would occur. Bryan Cnty., 520 U.S. at 407. While a pattern of constitutional violations is "ordinarily necessary" to establish the requisite notice that an official course of conduct is inadequate, the risk of a constitutional violation may be so obvious that the municipality's actions could demonstrate deliberate indifference to that risk. See Connick, 563 U.S. at 64. The Supreme Court in City of Canton v. Harris provided the following example of deliberate indifference: if city policy-makers, having armed their police officers with firearms, fail to train those officers on the constitutional limitations on

11

deadly force, that failure could be characterized as deliberate indifference. City of Canton, Ohio v. Harris, 489 U.S. 378, 390 n. 10 (1989). The Seventh Circuit in Glisson v. Indiana Department of Corrections provided another example: the failure to establish coordinated care protocols for inmates with chronic illnesses could reflect deliberate indifference if a jury found the need for those protocols obvious, even absent prior constitutional violations. Glisson v. Ind. Dep't of Corr., 849 F.3d 372, 382 (7th Cir. 2017). And in J.K.J. v. Polk County the Seventh Circuit provided another, one relevant to this case: the failure to institute more robust policies to prevent the sexual assault of female inmates in the face of a guard's escalating behavior can demonstrate deliberate indifference to the known or obvious risk of sexual assault. J.K.J., 960 F.3d at 385.

¶63 Third, Slabey must establish sufficient evidence for a jury to find that Dunn County's actions caused her injury. That is, the official actions must be the "moving force" behind the constitutional violation. Bryan Cnty., 520 U.S. at 400 (1997). A municipality cannot be held vicariously liable for the actions of its employee solely because it employed that employee. Monell, 436 U.S. at 691. Instead, the plaintiff must "demonstrate a direct causal link between the municipal action and the deprivation of federal rights." Bryan Cnty., 520 U.S. at 404.

¶64 Slabey established sufficient evidence for a jury to find for her on each of these three requirements by: (1) identifying a course of action by a final policy-maker——namely,

12

the Sheriff's choice to return Boigenzahn to his standard shift with no additional supervision; (2) alleging sufficient evidence for a jury to conclude that the risk of sexual assault was so predictable that the Sheriff's course of action constituted deliberate indifference; and (3) alleging sufficient evidence to show that the Sheriff's course of action caused the sexual assault. Her § 1983 claim against Dunn County should therefore survive summary judgment. I address how Slabey met each requirement in more detail below.

A. Official Policy, Custom, or Decision

¶65 Slabey met the first requirement for municipal liability under § 1983 because she identified a "deliberate choice to follow a course of action" by a final policy-maker. See Pembaur, 475 U.S. at 483. As Slabey points out, and Dunn County does not dispute, the Sheriff was the final policy-maker for staffing and disciplinary decisions at the Dunn County Jail. And he, as that final policy-maker, deliberately chose to adopt a particular course of action——to retain Boigenzahn and send him back to guard female inmates alone, on the lightest-staffed shift, with no additional supervision, investigation, or follow-

13

up.[5] The Sheriff had "various alternatives" to his course of action. See Pembaur, 475 U.S. at 483. One of those alternatives was to terminate Boigenzahn. Termination was not just an option, but (as the Sheriff acknowledged), the typical disciplinary response for violations of the fraternization policy. Another alternative was to adjust Boigenzahn's schedule to accommodate increased supervision and monitoring of his behavior. The Sheriff considered these alternatives, but instead chose the one course of action that would allow Boigenzahn to spend significant time alone and unmonitored with female inmates.

¶66 Slabey may not have identified a written policy that caused her injury, but she does not need to. Monell liability attaches where "a deliberate choice to follow a course of action

---

[5] Because Slabey focused on this particular course of action, this dissent will too. However, I note that in similar cases, plaintiffs have presented expert testimony identifying a variety of additional measures that jails must take to protect female inmates from sexual assaults. These measures include "informing guards of the inherent vulnerability the confinement setting presents to female inmates, educating jailers on the symptoms of an inmate suffering from the trauma of abuse, requiring officers to report each other's misconduct, or taking any time to otherwise instruct guards on matters of prevention and detection." J.K.J., 960 F.3d 367 at 379. Prevention and detection measures also include: a designated PREA coordinator, staff training on what to look for and how to report abuse as well as how to make inmates feel comfortable coming forward, taking additional care with job assignments within facilities, ensuring that all inmates understand their right to be free from sexual abuse and harassment as well as making sure inmates understand what abuse entails, and a confidential way for inmates to report abuse. Id. at 375. An additional, vital, and seemingly obvious prevention measure is not allowing male guards to be alone and unmonitored with female prisoners. Cash v. Cnty. of Erie, 654 F.3d 324, 331 (2d Cir. 2011).

14

is made among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Pembaur, 475 U.S. at 483. Slabey sufficiently identified that deliberate choice here.

### B. Culpability

¶67 Slabey also met the culpability requirement because she presented enough evidence for a jury to reasonably find that the Sheriff's official course of action was taken with deliberate indifference to the known or obvious risk that a sexual assault would occur. Whether the risks were known or obvious and whether the Sheriff acted with deliberate indifference are questions of fact. See Sherrod v. Lingle, 223 F.3d 605, 611 (7th Cir. 2000). Next I demonstrate how a jury, assessing the facts of this case, could reasonably conclude that: (1) Boigenzahn's prior behavior created a known or obvious risk that he would sexually assault an inmate and (2) the Sheriff's decision to send Boigenzahn back to guard female inmates reflected deliberate indifference to that risk.

### 1. Known or Obvious Risk of Sexual Assault

¶68 When evaluating Boigenzahn's prior conduct to determine whether the risk of sexual assault was known or obvious, it is important to note that "consent is not an issue" when a correctional officer has "sexual contact or sexual intercourse with an individual who is confined in a correctional institution if the actor is a correctional staff member." Wis. Stat. §§ 940.225(2)(h), 940.225(4). In enacting Wis. Stat. § 940.225(2)(h), the legislature barred consent from being a

15

defense in this context because it recognized that the power imbalance between correctional staff and inmates in the confinement setting, coupled with restrictions on inmates' freedom, make it impossible for inmates to freely consent. Because an inmate cannot consent to sexual conduct with a correctional staff member, an inmate's "words or overt actions that might indicate a freely given agreement to have sexual intercourse or sexual contact" in the outside world are irrelevant in this instance. See Wis. Stat. § 940.225(4). Accordingly, the deliberate indifference inquiry must be viewed through the correct lens of the confinement setting. And through this lens, conduct that merely foreshadows consensual sexual contact in other contexts may serve as notice of an obvious risk of sexual assault in the confinement setting. See Cash v. Cnty. of Erie, 654 F.3d 324, 337 (2d Cir. 2011) (noting that because (like Wisconsin) New York state law did not tolerate any sexual contact between guards and prisoners, jail officials "were thus obligated to do the same in carrying out their affirmative duty to protect prisoners from harm.").

¶69 A jury aware of the distinctive nature of sexual abuse in the correctional setting could, based on Slabey's evidence and reasonable inferences drawn from that evidence, make three factual findings: (1) Boigenzahn engaged in inappropriate behavior with female inmates, based on the corroborated reports of three different inmates; (2) Boigenzahn's behavior, particularly with A.D., was not just inappropriate, but sexually charged; and (3) Boigenzahn had a propensity to lie and conceal

16

inappropriate behavior unless directly confronted, and sheriff's department officials knew about this propensity. Based on these findings, a jury could reasonably conclude that the Sheriff had notice that Boigenzahn was engaging in a pattern of escalating and inappropriate behavior toward female inmates——including physical conduct——that was likely to lead to sexual assault. I will address each of the potential factual findings in turn.

¶70 First, based on the corroborated reports of three different inmates, a jury could find that Boigenzahn engaged in inappropriate behavior with female inmates, some of which was physical in nature. Two of those inmates warned sheriff's department officials that the behavior was likely to escalate, or "cross the line" if it had not already. One of the inmates, A.D., reported that Boigenzahn "made her uncomfortable," told her that "he didn't mind" when their hands accidentally touched, and, according to other inmates, even watched her while she slept. Additionally, Sheriff's department officials viewed video surveillance of Boigenzahn which corroborated some of the inmates' reports.

¶71 Second, a jury could reasonably infer that Boigenzahn's behavior, particularly with A.D., was not only inappropriate, but sexually charged. Just because a municipality labels behaviors as "fraternization" instead of sexual misconduct does not mean that the majority should defer to that characterization, or assume that a jury must. As Dunn County's own sexual misconduct policy acknowledges, sexual conduct encompasses a "range of behaviors," including, for

17

example, "conduct of a sexual nature or implication" and "unreasonable or unnecessary invasion of privacy." A jury could reasonably conclude that Boigenzahn's physical conduct with A.D. was "conduct of a sexual implication." A jury could also reasonably conclude that "obsessing" over an inmate and watching her sleep is an "unreasonable or unnecessary invasion of privacy."

¶72 The majority errs when it dismisses Boigenzahn's prior behaviors and mischaracterizes them as "nonsexual." See majority op. at ¶¶36, 39. In doing so, the majority incorrectly draws inferences in Dunn County's favor, rather than Slabey's favor. See Burbank Grease Servs., LLC v. Sokolowski, 2006 WI 103, ¶40, 294 Wis. 2d 274, 717 N.W.2d 781 (when reviewing a summary judgment decision, "we draw all reasonable inferences from the evidence in the light most favorable to the non-moving party."). Sheriff's department officials viewed surveillance footage of Boigenzahn quite literally "playing footsie" with A.D., which even the Oxford English Dictionary recognizes as "surreptitiously touching a person's foot or ankle with one's foot . . . as a playful expression of sexual attraction" (emphasis added). Officials also viewed footage of A.D. stroking Boigenzahn's chest and shoulder after he beckoned her over to him. And A.D. reported that Boigenzahn told her that he "didn't mind" when their hands touched. A jury, viewing Boigenzahn's behavior in the proper context of the confinement setting and drawing on their life experiences and common sense,

18

could reasonably conclude that his actions were sexually charged.

¶73 Third, a jury could find that Boigenzahn had a propensity to lie and conceal inappropriate behavior, and that the sheriff's department officials knew about his dishonesty. Officials knew that Boigenzahn initially lied about passing notes between male and female inmates, and only confessed when told that he would be terminated for being untruthful. Additionally, Boigenzahn himself admitted to officials that he "tends not to tell the truth." And finally, officials knew that Boigenzahn appeared to intentionally stand out of camera view in the Huber Dorm. A jury could find that the Sheriff knew that he could not trust Boigenzahn due to his deceptive tendencies, yet chose to put him back in the female dorm, without the supervision or monitoring that Boigenzahn clearly needed.

¶74 Taking all of these facts and inferences together, a jury could find that there was a known or obvious risk that Boigenzahn's behavior would escalate to sexual assault. The jury could find that the Sheriff received notice from multiple female inmates that Boigenzahn's behavior was escalating, had become physical, and would cross the line from merely inappropriate to predatory, if it had not already. The jury could find that this escalating behavior was, at the very least, "conduct of a sexual implication" that——along with the inmates' warnings——created notice of an obvious risk that sexual assault would occur. The jury could find that Boigenzahn had already lied to sheriff's department officials and attempted to evade

19

detection for his behaviors——thus, he could not be trusted and clearly required supervision and monitoring. Taking all these facts together in the context of the confinement setting, with its stark power imbalance between guards and female inmates, the jury could reasonably conclude that Boigenzahn's behavior created a known or obvious risk that he would sexually assault an inmate.

## 2. Deliberate Indifference to the Known or Obvious Risk of Sexual Assault

¶75 A jury, having found that Boigenzahn's actions created an obvious risk that sexual assault would occur, could further find that the Sheriff's decision to put Boigenzahn back on his normal shift reflected deliberate indifference to that risk.

¶76 In determining that the Sheriff was not deliberately indifferent, the majority suggests that the Sheriff's chosen course of action——suspending Boigenzahn for three days——was a "severe" response to Boigenzahn's behavior, and that the Sheriff chose it over less severe options. See majority op. at ¶¶36, 38. This does not square with the Sheriff's admission that "historically fraternization turns into a termination," and that a short suspension was the "minimum" appropriate disciplinary action for passing notes. The Sheriff's disciplinary response was lenient, based on his own admissions, and does not preclude a finding of deliberate indifference as a matter of law. See Cash, 654 F.3d 324 (2d Cir. 2011) (upholding a jury finding of deliberate indifference even though the sheriff's department had previously suspended a guard for misconduct).

20

¶77 The majority also concludes that the Sheriff's decision to send Boigenzahn back to guard the female prisoners on the night shift was not deliberate indifference in part because moving Boigenzahn to a different shift with more supervision "would affect somebody on day shift that would be bumped off from that shift and forced onto the night shift." See majority op. at ¶11. But the administrative inconveniences inherent to protecting constitutional rights in the confinement setting are no excuse for failing to protect those rights. For instance, the difficulty in finding the time and staff to train officers about the constitutional limits on excessive force before handing those officers firearms would not preclude a finding of deliberate indifference. See Canton, 489 U.S. at 390 n. 10. Nor would any difficulties, staffing or otherwise, in enacting "centralized treatment protocols for chronically ill inmates." See Glisson, 849 F.3d at 382. Replacing one staff member or changing one staff member's schedule is not "unworkable," as the majority suggests, see majority op. at ¶39, but in fact a relatively small undertaking compared to adopting a new training program or revamping healthcare protocols; therefore, it is difficult to understand why the inconvenience of doing either would preclude a jury from finding for Slabey on the deliberate indifference element of the Monell test. The Sheriff may have decided to retain Boigenzahn despite his behavior toward female inmates in part because replacing him would be inconvenient, and "[Boigenzahn] had been a pretty good jailer on other notes," but the choice still demonstrated a

21

deliberate indifference to the "note" that mattered here—the safety of female inmates.

## C. Causation

¶78 Slabey also established enough evidence for a jury to reasonably find that the Sheriff's course of action caused Slabey's injury.

¶79 Much of the same evidence that supports Slabey's claim on the culpability requirement also supports it on the causation requirement. Specifically, evidence of an obvious risk of sexual assault can support both a finding of "deliberate indifference" and "an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable." Bryan Cnty., 520 U.S. at 409-410. If a jury could reasonably conclude that the risk of sexual assault was obvious enough that the failure to take action constituted deliberate indifference, it may take "but a small inferential step" for a jury to find that the failure to take action caused the injury. J.K.J., 960 F.3d at 384. Causation, like culpability, is a fact question for a jury—"finding causation is not a mechanical exercise like working a math problem and getting an answer, but instead requires jurors to view evidence in its totality, draw on their life experiences and common sense, and then reach reasonable conclusions about the effects of particular action *and* inaction" (emphasis in original). Id. at 384-385. Here, Slabey established enough evidence for a jury to do so.

¶80 Slabey's evidence "paved multiple roads for the jury to travel" to find that the Sheriff's actions caused her injury. See id. at 385. A jury could find that if the Sheriff had pursued the typical course of action and terminated Boigenzahn for his violations of the fraternization policy (and arguably, the sexual misconduct policy, as discussed above), Boigenzahn would not have had access to sexually assault Slabey or any other inmate. A jury could alternatively find that if the Sheriff had instead switched Boigenzahn to a shift that allowed for more supervision, Boigenzahn would have been prevented from spending a significant amount of time alone and unmonitored with female inmates, and thus would have either been dissuaded from sexually assaulting an inmate for fear of the consequences, or denied the opportunity to sexually assault an inmate at all. A jury could also infer that the Sheriff's failure to take any additional action to protect female inmates both emboldened Boigenzahn and silenced inmates who now understood that objecting to his behavior was essentially futile. Since any of these inferences would be reasonable, a jury could conclude from Slabey's evidence that the Sheriff's course of action caused the sexual assault to happen.

¶81 The Sheriff's actions were the "moving force" behind Slabey's injuries. See Bryan Cnty., 520 U.S. at 400. This is not a case where a plaintiff is attempting to prove causation simply by showing that she would not have been sexually assaulted "but for" the municipality's original decision to hire the perpetrator. See id. Instead, Slabey established that her

23

sexual assault was caused by the Sheriff's decision to put a guard with a known history of inappropriate and arguably sexual conduct toward female inmates back in a position where he would be alone and unmonitored with those inmates. The Sheriff's decision was thus not only a "but for" cause of Slabey's injuries, but "closely related to the ultimate injury." See Canton, 489 U.S. at 391. A jury could therefore reasonably find that Slabey has met the causation requirement.

¶82 Because Slabey established sufficient evidence that a final policy-maker acted with deliberate indifference to a serious risk of sexual assault, and in doing so caused her sexual assault, she has met all three requirements for Monell liability. Based on the evidence Slabey provided, a jury could reasonably find that the Sheriff knew that he was essentially sending a fox back to guard the hen house, and in doing so was deliberately indifferent to the constitutional rights of Dunn County inmates. Therefore, Slabey's § 1983 claim against Dunn County should survive summary judgment.

### III. CONCLUSION

¶83 Based on the evidence Slabey provided, a jury could find that Dunn County Sheriff's Department officials ignored the clear warning signs that Boigenzahn had already engaged in inappropriate and escalating behavior with female inmates and then created the circumstances that allowed Boigenzahn to sexually assault Slabey. The Sheriff's deliberate course of action enabled Boigenzahn to escape detection for 45 minutes as he was working alone, unsupervised, and unmonitored in the Huber

24

dorm on the night he sexually assaulted Slabey. Slabey provided sufficient evidence for a jury to reasonably find that the Sheriff's course of action both demonstrated deliberate indifference and was the causal "moving force" behind the sexual assault. Slabey's § 1983 claim against Dunn County should therefore survive summary judgment.

¶84 When municipalities take inmates into custody, they assume a responsibility to protect them from sexual assault. But this responsibility means little if the justice system is unwilling to hold municipalities accountable when they fail to protect their inmates. When municipalities are not held to account, measures like PREA, enacted to eliminate sexual assault in jails and prisons, are reduced to little more than a perfunctory policy for correctional staff to sign, then freely disregard. Dunn County threw a match into the tinderbox when it sent Boigenzahn back to guard female inmates. The majority's failure to hold Dunn County accountable is akin to standing idly by as the fire burns.

¶85 I am authorized to state that Justice ANN WALSH BRADLEY joins this dissent.

25